RAFAEL A. BUSCAGLIA y RAFAEL DE J. CORDERO, en su carácter de TESORERO y de AUDITOR DE PUERTO RICO, respectivamente, ETC., peticionarios, *v.* CORTE DE DISTRITO DE SAN JUAN, HON. MARCELINO ROMANY, JUEZ, demandada, MUNICIPIO DE CAGUAS, ET AL, interventores.

Núm. 18.—*Sometido:* Julio 14, 1944. *Resuelto:* Julio 28, 1944.

*Hon. Procurador General Interino Jesús A. González, Miguel Guerra-Mondragón y E. Campos del Toro,* abogados de los peticionarios; *F. Fernández Cuyar y H. González Blanes,* abogados del peticionario en el caso principal; *E. Ramos Antonini y V. Gutiérrez Franqui,* abogados de los interventores.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

El presente es tal vez uno de los casos más importantes y de mayor trascendencia entre los sometidos a la decisión de este tribunal durante el curso de su existencia, pues envuelve problemas sociales y cuestiones jurídicas íntimamente relacionados entre sí, y entre ellos, la determinación de la regla que debe prevalecer en esta jurisdicción en cuanto a la capacidad de un contribuyente para iniciar un procedimiento de *injunction* de la naturaleza del presente.

Antes de plantear, considerar y resolver las tres cuestiones fundamentales envueltas en este litigio, es conveniente que hagamos una síntesis de los hechos, sobre los cuales no existe controversia alguna.

El 27 de noviembre de 1942, la Asamblea Legislativa de Puerto Rico aprobó la Ley núm. 16 (Segunda y Tercera Sesiones Especiales, 1942, página 51), cuyos propósitos esenciales tales y como aparecen expresados en su título y en la Exposición de Motivos (sección 1) eran: declarar la existencia en Puerto Rico de un estado de emergencia grave ocasionado por la guerra; autorizar programas de trabajos de emergencia, para dar trabajo a los desempleados; autorizar proyectos de compensación de desempleo, auxilio, abaratamiento de precios y siembra y distribución de alimentos, etc. La dirección y supervisión del programa de emergencia fueron encomendados a un Consejo Insular de Emergencia integrado por el Gobernador y los Jefes de los ocho departamentos del Gobierno Insular, incluyendo al Auditor de Puerto Rico.

Para dar cumplimiento a los indicados propósitos, por la sección 14 de dicha ley se asignó ''la suma de diez millones (10,000,000) de dólares, de cualesquiera fondos existentes en la Tesorería de Puerto Rico no destinados a otras atenciones, más el setenta (70) por ciento de los ingresos del Tesoro Insular por concepto de la recaudación del impuesto federal de rentas internas sobre espíritus destilados embarcados o que se embarcaren de Puerto Rico a Estados Unidos a partir del primero de noviembre de 1942''. De acuerdo con la misma sección 14, los diez millones de dólares de los fondos generales del Tesoro Insular debían destinarse así:

Al programa de trabajo de emergencia_____ $4, 000, 000
A trabajos de siembra y cultivo_____ 4, 000, 000
A compensación de desempleo, auxilio, abaratamiento de precios, subsidios, etc._____ 1, 100, 000
Para aumentar facilidades de transportación_____ 900, 000

Los fondos procedentes de las rentas internas sobre el alcohol debían destinarse a los siguientes fines:

Al programa de trabajo de emergencia y siembra y cultivo de productos alimenticios, no menos del 50 por ciento

de los ingresos totales del Tesoro Insular por el indicado concepto.

Para compensación de desempleo, auxilio, abaratamiento de precios, subsidios, etc. no menos del 20 por ciento del total ingresado en el Tesoro Insular por concepto del mencionado impuesto federal.

La mencionada Ley núm. 16, por ser de carácter urgente, empezó a regir inmediatamente después de su aprobación o sea el 27 de noviembre de 1942. Seis meses más tarde, en mayo 15 de 1943, la legislatura aprobó la Ley núm. 181 (Leyes de 1943, pág. 655), por virtud de la cual se enmendó el título de la Ley núm. 16 de 1942, con el propósito de "asignar fondos para la División de Bienestar Público del Departamento de Sanidad, para comedores escolares, para escuelas maternales (*nursery schools*) y. para distribución gratis de alimentos excedentes (*free surplus food distribution*)". La sección 14 de la citada Ley núm. 16 quedó enmendada y redactada de modo que se lea como sigue:

"Sección 14.—Para dar cumplimiento a los fines de esta Ley, por la presente se asigna la suma de diez y seis millones ($16,000,000) de dólares, *o la parte de ella que fuere necesaria en cualquier año económico a juicio del Consejo Insular de Emergencia,* de cualesquiera fondos existentes en la Tesorería de Puerto Rico no destinados a otras atenciones; *Disponiéndose,* que del total de esta asignación, la cantidad de cuatro millones (4,000,000) de dólares no estará disponible hasta el primero de julio de 1943; etc." (Bastardillas nuestras).

Continúa la sección 14, según quedó enmendada, disponiendo la forma en que deberán distribuirse los diez y seis millones:

Para el programa de trabajo de emergencia debiendo destinarse no menos del 50 por ciento del total asignado a proyectos de siembra y cultivo de productos alimenticios_____ $11,500.000
Para proyectos de compensación de desempleo, auxilio, abaratamiento de precios, subsidios, préstamos y ayuda económica general_____ 2,300,000

| | |
|---|---|
| Para el "Fondo de Bienestar Público, Fondo de Depósito", de la División de Bienestar Público del Departamento de Sanidad | 1,500,000 |
| Para comedores escolares | 350,000 |
| Para distribución gratis de alimentos | 200,000 |
| Para escuelas maternales | 50,000 |

Termina la Ley núm. 181 de 1943 disponiendo por su sección 3 que sus efectos "se hacen retroactivos a la fecha en que entró en vigor la citada Ley núm. 16 aprobada en 27 de noviembre de 1942, tal como si la misma hubiera sido aprobada originalmente en la forma en que ha sido enmendada por esta Ley; *Disponiéndose,* que cualquier cantidad que haya sido llevada a los libros de Asignaciones de acuerdo con la citada Ley núm 16 aprobada en 27 de noviembre de 1942, *será considerada como parte del total asignado por la presente Ley*". (Bastardillas nuestras).

El 29 de junio de 1944, el Sr. Celestino Iriarte Miró, en su carácter de contribuyente al Erario Público, radicó ante la Corte de Distrito de San Juan una petición de injunction contra los señores Rafael Buscaglia, en su carácter de Tesorero de Puerto Rico y Rafael de J. Cordero, en su carácter de Auditor de Puerto Rico y contra los señores Antonio Fernós Isern, Jesús A. González, José M. Gallardo, Rafael Buscaglia, Sergio Cuevas, Luis A. Izquierdo, Manuel A. Pérez y Rafael de J. Cordero, como miembros integrantes del Consejo Insular de Emergencia. En la petición, después de hacer una relación detallada sobre la aprobación y el contenido de las Leyes núm. 16 de 1942 y núm. 181 de 1943, se alegó en síntesis lo siguiente:

Que el 15 de febrero de 1944, con motivo de un informe suministrado a la Asamblea Legislativa de Puerto Rico por el Tesorero y por el Auditor de Puerto Rico, fué presentado en el Senado el Proyecto del Senado núm. 28 para asignar de cualesquiera fondos disponibles en el Tesoro Insular, no destinados a otras atenciones, la suma de $21,500,000, la que sería puesta a disposición del Consejo Insular de Emergen-

16

cia, para los fines especificados en la Ley núm. 16 de 1942, según quedó enmendada; que en dicho proyecto se disponía que la suma de $21,500,000 se asignaba en adición a la de $16,000,000 asignada por la Ley núm. 181 de 1943; y que dicho proyecto no fué aprobado por la Asamblea Legislativa de Puerto Rico.

Que el 7 de marzo de 1944 se radicó en la Cámara de Representantes de Puerto Rico el P. de la C. núm. 130, redactado substancialmente en los mismos términos y para los mismos fines del P. del S. núm. 28, a que ya nos hemos referido; y que el referido P. de la C. núm. 130 tampoco fué aprobado por la Asamblea Legislativa.

Que la suma de $16,000,000 asignada por las Leyes 16 de 1942 y 181 de 1943, está ya totalmente agotada, habiendo sido destinada por el Consejo Insular de Emergencia para proyectos y gastos ya aprobados, razón por la cual el Consejo Insular de Emergencia, desde el 1 de julio de 1944 en adelante no tendrá a su disposición dinero alguno procedente de dicha asignación de diez y seis millones de dólares.

Que los demandados intentan y se proponen utilizar una suma adicional de $16,000,000, procedentes de los fondos ordinarios del Tesoro Insular, de julio 1 de 1944 en adelante, para ser dedicada a los fines y propósitos de la Ley 16 de 1942, según fué enmendada por la núm. 181 de 1943, todo ello a pesar de no existir asignación alguna legislativa de dicha suma adicional de diez y seis millones de dólares y de que la Asamblea Legislativa se negó dos veces a asignar fondos algunos adicionales.

Que la asignación y el uso de los diez y seis millones adicionales, sin estatuto o ley alguna que lo autorice, constituyen un acto ilegal y contrario a la Carta Orgánica de Puerto Rico y un uso indebido y *ultra vires* de facultades legislativas por parte de funcionarios ejecutivos y administrativos.

Termina el peticionario alegando que los fondos que los demandados pretenden utilizar son fondos ordinarios del Tesoro Insular, procedentes de contribuciones impuestas y

cobradas al peticionario y a los demás contribuyentes de Puerto Rico; que el demandante y todos dichos contribuyentes son dueños en equidad de dichos fondos ordinarios; que el uso indebido e ilegal de esos fondos ocasionará daños irreparables al peticionario y a todos los demás contribuyentes, quienes tendrán que aportar nuevas contribuciones para cubrir la deficiencia creada por el uso ilegal; y, por último, que el peticionario carece de otro recurso adecuado, rápido, y eficaz que no sea el de injunction.

Citados para mostrar causas por las cuales no debiera expedirse el auto de injunction preliminar solicitado, comparecieron los demandados el 7 de julio de 1944 y radicaron su contestación. Las partes esenciales de la misma son:

1. Se admite que los demandados se proponen utilizar $16,000,000 adicionales de los fondos ordinarios del Tesoro Insular para los fines determinados en las leyes en controversia, pero se niega que no exista asignación legislativa alguna por dicha suma adicional. En apoyo de esta aseveración, se alega que la Cámara de Representantes aprobó una asignación de $21,500,000 y el Senado otra de $23,000,000, para el trabajo de emergencia de guerra, pero se admite que ninguna de dichas dos asignaciones fué aprobada por ambas Cámaras. Se alega que la discrepancia entre ambas Cámaras fué ocasionada por el Proyecto núm. 130 de la Cámara, a virtud del cual se pretendió crear un Consejo Insular de Emergencia integrado, entre otros, por cuatro miembros, nombrados por el Gobernador, a propuesta cada uno de ellos por el organismo director central de cada uno de los partidos políticos cuyo candidato a Comisionado Residente en las precedentes elecciones generales obtuvo el 10 por ciento o más del total de votos emitidos para todos los candidatos a dicho cargo de Comisionado Residente; que con el propósito de lograr una medida conciliatoria, el Senado aprobó el P. del S. núm. 144, por virtud del cual se prohibían y se castigaban como delitos públicos los discrímenes por razones políticas en

el programa de trabajo y auxilio de emergencia; y que fué debido a discrepancias de orden fundamental entre la Cámara y el Senado, "que a la terminación del año fiscal anterior las asignaciones necesarias para el sostenimiento de las actividades de emergencia de guerra del Gobierno no fuesen aprobadas por la Legislatura".

Alegaron los demandados que la asignación de $16,000,000 adicionales no es ni ilegal ni *ultra vires* y que, por el contrario, "es legal y constitucional no tan sólo por constituir una asignación continua y permanente si que también por constituir una reasignación automática de fondos necesarios para el sostenimiento del Gobierno de Puerto Rico".

Sostuvieron los demandados, que la negativa de la Asamblea Legislativa a aprobar durante la sesión ordinaria de 1944 fondos adicionales para el programa de emergencia, "operó en sentido de reapropiar automáticamente la suma original de $16,000,000 de acuerdo con la sección 34 de la Carta Orgánica de Puerto Rico".

Los demandados interpusieron varias defensas especiales. De ellas solamente merecen consideración las siguientes:

(*a*) Que el demandante carece de un interés real, efectivo y verdadero en ley que le capacite para ejercer esta acción.

(*b*) Que el Auditor de Puerto Rico tiene la facultad exclusiva de pasar sobre la legalidad de los desembolsos del Gobierno de la Isla.

Previo permiso que les fuera concedido por la corte de distrito, intervinieron en el procedimiento los municipios de Caguas, Salinas y Patillas y también varias personas de las que reciben $7.50 mensuales de los fondos del Plan de Emergencia de Guerra. En obsequio a la brevedad nos abstendremos de hacer una relación de las defensas interpuestas por los interventores, por ser en realidad idénticas a las presentadas por los demandados.

En julio 12 de 1944, la Corte de Distrito de San Juan dictó una orden de entredicho prohibiendo a los demandados

que "lleven a cabo, verifiquen, completen o hagan asignación, apropiación o uso alguno de partida de dinero alguna, procedente de los fondos ordinarios del Tesoro Insular de Puerto Rico, para ponerlos a disposición del Consejo Insular de Emergencia para los fines y propósitos enunciados en la Ley núm. 16 de 1942, según enmendada, prohibiéndoseles, asimismo, que continúen desembolsando o disponiendo de dichos fondos para dichos fines o propósitos". En la orden se dispone que la misma no entrará en vigor hasta tanto el peticionario preste una fianza por la suma de $5,000; y que el entredicho continuará en vigor "hasta que este tribunal dicte resolución o sentencia en el presente caso en relación con el injunction preliminar solicitado o en relación con el injunction permanente interesado, si es que el tribunal resuelve tener jurisdicción para dictar sentencia final en relación con la solicitud de *injunction* permanente".

Tan pronto como fueron notificados con copia de la orden de entredicho, el mismo día 12 de julio de 1944, los demandados acudieron ante esta Corte Suprema en solicitud de un auto de *certiorari* con el fin de revisar la resolución dictada por la corte inferior. Expedimos el auto y a petición de los demandados y en auxilio de la efectividad de la jurisdicción de este tribunal, expedimos también una orden suspendiendo los efectos de la orden de entredicho recurrida, hasta tanto esta corte tuviera una oportunidad de oír a las partes y de resolver la cuestión en controversia en sus méritos.

El 14 de julio de 1944 se celebró la vista del recurso. Las partes interesadas, representadas todas ellas por eminentes letrados, fueron oídas ampliamente, quedando el caso definitivamente sometido a nuestra decisión.

Como extracto o esencia de la brillante argumentación oral del caso y de los alegatos sometidos por los abogados de las partes contendientes, surgen tres cuestiones legales fundamentales. Las expondremos, discutiremos y resolveremos en el siguiente orden:

■ Primera: ¿Tiene el contribuyente Celestino Iriarte Miró algún interés especial, de naturaleza tal que le capacite para el ejercicio de la acción de injunction, a la cual ha recurrido en el presente caso?

Ambas partes han aceptado que no existe discrepancia alguna entre las autoridades en cuanto al derecho que tiene un contribuyente para impedir por medio de injunction el gasto ilegal de fondos. municipales. Algunas decisiones se basan en la analogía existente entre una corporación municipal y una corporación privada (IV Dillon, Municipal Corporations, 5th ed. sec. 1580). En otras se considera a los contribuyentes como dueños en equidad de los fondos públicos.

También está fuera del campo de la discusión el que la jurisprudencia federal ha sentado de. manera definitiva la doctrina que niega al contribuyente el derecho· a impedir el uso de fondos federales. Véanse: *Massachusetts* v. *Mellon,* 262 U.S. 447, 67 L. Ed. 1078; *Alabama Power Co.* v. *Ickes,* 302 U.S. 464, 82 L. Ed. 374; *Perkins* v. *Lukens· Steel Co.,* 310 U.S. 113, 84 L. Ed. 1108.

En la mayoría de las jurisdicciones estatales se concede al contribuyente el derecho de acudir ante una corte de equidad para impedir el uso ilegal o no autorizado de fondos del estado. Y se basan esas decisiones en que en verdad no existe diferencia alguna entre los funcionarios municipales y los estatales.(¹)

En otras jurisdicciones se ha sostenido que del mero hecho de ser contribuyentes no surge el derecho a demandar a los

---

(¹) *Leckenby* v. *Post Printing and Publishing Co.* (1918) 65 Colo. 443, 176 Pac. 490; *Rockne* v. *Olson,* (1934) 254 N. W. 5 (Minn.); *Wertz* v. *Shane* (1933) 249 N. W. 661 (Iowa); *Reid* v. *Smith* (1940) 375 Ill. 147, 30 N. E. (2d) 908. Véanse, además, *Conway* v. *New Hampshire,* (1938) 199 Atl. 83, 86; *Page* v. *King,* 131 Atl. 707; *Sun Cab Co.* v. *Cloud* (1932) 159 Atl. 922; *Stewart* v. *Stanley* (1941) 199 La. 146, 5 So. (2d) 531; *Goode* v. *Tyler* (1939) 186 So. 129; *State* v. *Kelly* (1937) 274 N. W. 319; *Fisher* v. *Marsh* (1925) 113 Neb. 153, 202 N. W. 422; *Castilo* v. *State Highway Commission* (1925) 312 Mo. 244, 279 S. W. 673; *Castle* v. *Kapena,* 5 Hawaii 27, 28; *Hall* v. *Blan,* 148 So. 601; *Carso* v. *Board,* etc., (La. 1944) 17 So. (2d) 358.

funcionarios del estado. Es necesario alegar y probar daños especiales.(²)

El caso de autos presenta la decisión de una cuestión de carácter local. Estamos, por tanto, en libertad de sentar para esta jurisdicción la regla que consideremos más apropiada de acuerdo con nuestra peculiar situación gubernamental, y a ese efecto, no estamos obligados a seguir la regla federal establecida en el caso de *Massachusetts* v. *Mellon,* supra, y nos inclinamos a aceptar como más razonable la regla sentada por la mayoría de las jurisdicciones estatales, reconociendo el derecho del contribuyente a acudir ante una corte de equidad para impedir el uso, sin previa autorización legislativa, de fondos estatales por funcionarios ejecutivos del Estado. El reconocimiento de ese derecho es más necesario en Puerto Rico que en las comunidades estatales. En éstas, el Jefe Ejecutivo o los Jefes de Departamentos que actuando *ultra vires* o sin autorización de la legislatura usen indebidamente los fondos públicos, pueden ser sometidos a un procedimiento de *"impeachment"* y castigados por su actuación ilegal. Si en Puerto Rico, cuya Legislatura carece de facultades para iniciar procedimientos de "impeachment" y cuyos altos funcionarios ejecutivos no derivan sus facultades y poderes del consentimiento de los gobernados, adoptásemos la regla que sigue una minoría de las jurisdicciones estatales e ignorásemos que la tendencia moderna es en el sentido de reconocer el derecho del contribuyente a demandar a los que usen indebidamente fondos públicos, tendríamos que admitir que en esta jurisdicción puede cometerse el acto ilegal de usar desautorizadamente fondos públicos, sin que exista un remedio eficaz para impedirlo o para castigarlo. Tendríamos que confesar que en Puerto Rico la máxima legal *ubi jus, ibi remedium* carece de significado.

(²) *Crews* v. *Beattie* (S. C.) 14 S. E. 2d 351; *State* v. *Showalter* (Wash.) 293 Pac. 1000; *Sanders* v. *Ballard,* (Ga.) 127 S. E. 851; *State* v. *American, etc.* (Tenn.) 72 S. W. (2d) 775; *Pierce* v. *Smith,* (Kan.) 29 Pac. 565; *Deering* v. *Martin,* (Fla.) 116 So. 54; *Milwaukee etc.* v. *Hill,* 241 N. W. 364; *Asplund* v. *Hannett,* 31 N. M. 641, 249 Pac. 1074.

En 50 Harvard Law Review, 171, 231, 247 y bajo el título "Simpson, Fifty Years American Equity", encontramos esta elocuentísima defensa del derecho del contribuyente a intervenir en estos casos:

"En muchas de las grandes ciudades americanas y en algunos estados se ha hecho cada vez más difícil el asegurar, o aun fomentar, la honestidad oficial o la observancia de la ley colocando la facultad de controlar la extravagancia o la debilidad de un funcionario en las manos de otro. *¿Quis custodiet custodes?* Aun cuando la acción legal del contribuyente está lejos de ser un medio enteramente satisfactorio para fomentar un mínimum de decencia fiscal estatal o municipal, ha demostrado su utilidad allí donde se ha permitido. Si algún ciudadano de espíritu público (o encolerizado) se decide a demandar y logra conseguir un *injunction* contra los gastos ilegales, es probable que el efecto sobre el tesoro público sea más saludable que si el asunto se deja 'pendiente del veredicto del pueblo en las urnas'—frase que muy bien merce figurar junto a esa muy abusada palabra 'patriotismo' en la definición de Samuel Johnson.

"      .      .      .      .      .      .      .

"Los procedimientos de equidad han demostrado sin embargo, ser una ayuda prácticamente indispensable para un gobierno efectivo bajo las condiciones modernas, y con frecuencia han servido como un freno saludable contra la acción oficial ilegal."

Se aduce como argumento en contra del alegado derecho del contribuyente aquí peticionario, que su interés es tan pequeño y el daño que se le pueda causar tan incierto, que no estaría justificada la orden de injunction que se solicita para impedir que se continúe el gasto ilegal de fondos públicos. No nos convence este argumento. La acción que se ejercita, aun cuando no pueda ser considerada estrictamente como un pleito de clase (*class-suit*), puede y debe ser considerada como una acción de carácter público. Como se dijo en *Stewart* v. *Stanley, Atty. Gen.*, 5 So. (2d) (La. 1941) 531, 536: "Si un contribuyente no puede quejarse,—¿qué otra persona tendría ese derecho?"(3)

---

(3) Otros casos de Louisiana sosteniendo la misma regla son: *Donaldson* v. *Police Jury*, 109 So. 34; *Borden* v. *Louisiana Board of Education* 123 So. 655 y *Graham* v. *Jones*, 3 So. (2d) 761.

El estado de Louisiana es uno que en lo sustantivo se rige, al igual que Puerto Rico, por un Código Civil y no por el derecho común prevaleciente en la mayoría de los demás estados de la unión. Cuando la Legislatura de Louisiana quiso limitar el alcance de la jurisdicción de las cortes para conceder un *restraining order* contra funcionarios del gobierno lo hizo expresamente por ley en el año 1942. (Leyes de 1942, núm. 132, sec. 1).

El territorio de Hawaii, cuyas relaciones y nexos políticos con los Estados son en cierto modo similares a los nuestros, ha reconocido el derecho del contribuyente a solicitar un *injunction* para impedir la realización por un funcionario público de un acto ilegal y perjudicial al tesoro público. En el caso de *Castle* v. *Kapena, Ministro de Hacienda,* 5 Hawaiian Rep. 27, el Ministro demandado trató de emitir bonos del Gobierno de acuerdo con la ley, pero se disponía a aceptar en pago de los bonos monedas de plata de un valor de solamente 82 por ciento del valor de la moneda de oro de Estados Unidos. La ley disponía que no debían ser emitidos por menos de su valor a la par en oro o su equivalente. Castle, un contribuyente, acudió ante la Corte Suprema del Territorio en solicitud de *mandamus*. La corte opinó que no procedía el mandamus, pero sí el injunction, y se expresó así:

"El Ministro, al expedir los bonos por menos de su valor a la par, se disponía a realizar un acto ilegal. No hay duda de que con ello se causaría una pérdida y un daño al país, y a cada contribuyente; y se levanta la cuestión, sobre si los peticionarios pueden recurrir a esta Corte en demanda de protección.

"Se dice, en defensa del demandado, que como el peticionario no sufre un daño especial y privado, no puede alegar que tiene personalidad para acudir a esta corte. Existe jurisprudencia en apoyo de esta posición. Bajo ciertas circunstancias, incumbiría al Procurador General, o al funcionario que ocupe una posición análoga, incoar los procedimientos. . .

"La falta de otro remedio es siempre una razón poderosa para la aplicación de remedios extraordinarios. Se ha sugerido para este caso el remedio de *impeachment*. Si estos bonos se expidiesen ile-

galmente, y con pérdida para los contribuyentes, el *impeachment* del Ministro, si se consiguiera, aun cuando lo desacreditaría, no serviría para reponer la pérdida causada al país, ni para retirar los bonos; . . . El *impeachment* no sería un remedio adecuado.''

En *Castle* v. *Secretary of the Territory*, 16 Hawaiian Rep. 769, la Corte Suprema de Hawaii reafirmó lo resuelto en el caso anterior, diciendo:

"El derecho de un contribuyente a incoar una acción para impedir que un funcionario público realice un acto ilegal ha sido definitivamente reconocido en esta jurisdicción desde el caso de *Castle et al.* v. *Kapena*, 5 Haw. 27, (1883). . .

"El uso de fondos públicos no es una cuestión académica o abstracta y sí una que afecta vitalmente a cada contribuyente. Confiamos en que nunca llegará el día en Hawaii en que los contribuyentes no se cuiden de conseguir evitar por medio de procedimientos legales apropiados el uso ilegal de fondos públicos en conexión con un estatuto anticonstitucional. Pero hay algo más importante que esas exhibiciones de espíritu público por parte de los contribuyentes, y es la sensación de confianza en que las cortes interpretarán las leyes y declararán la ley con imparcialidad judicial y sin prejuicios por causa de motivos o sentimientos personales.''

Numerosa y de gran fuerza de convicción es la jurisprudencia citada por el contribuyente en apoyo de su derecho a solicitar el remedio de injunction. Nos limitaremos a citar los casos en la nota al margen.(4)

Convenimos con la jurisprudencia citada en que crearíamos en esta Isla una situación deplorable si negáramos al ciudadano contribuyente el derecho de acudir a los tribunales en demanda de protección contra el uso ilegal de fondos públicos por funcionarios públicos. Estos son los servidores y no los amos de los contribuyentes, y no hay razón legal alguna para que se les considere fuera del alcance de los pode-

---

(4) *Croach* v. *Bennett*, 17 S. E. 2d (S. C.) 320; *Page* v. *King*, 131 Atl. 707; *Clark* v. *Crown Drug Co.*, 152 S. W. (2d) 145; *Conway* v. *Water Resources Board*, 199 Atl. 83; *Leckenby* v. *Post Printing & P. Co.*, 65 Colo. 443; *Gaston* v. *State Highway Dept.*, 132 S. E. 680; *Fischer* v. *Marsh*, 202 N. W. 422; *White Eagle Oil etc. Co.* v. *Gunderson*, 205 N. W. 614, 43 A.L.R. 397; *Castilo* v. *State Highway Com.*, 279 S. W. 673; *Anderson* v. *Houtes*, 240 S. W. 647.

res de una corte de equidad, cuando el ejercicio de esos poderes fuere necesario para obligarles a actuar dentro de los límites de la ley.

Se dirá que si reconocemos el derecho del contribuyente a iniciar procedimientos de esta naturaleza, abriremos la puerta a una multiplicidad de pleitos, pues muchos contribuyentes acudirán viciosamente a los tribunales para tratar de paralizar el funcionamiento del Gobierno. La objeción no es muy convincente. Debemos presumir que las cortes de distrito, investidas por nuestras leyes con la facultad de expedir autos de injunction, no han de expedirlos cuando se trate de casos frívolos y carentes de méritos; que no se prestarán a servir de dóciles instrumentos a las maquinaciones que tiendan a obstaculizar a los funcionarios públicos en el cumplimiento de sus deberes; y que no solamente desestimarán las peticiones carentes de méritos, si que también castigarán a los que invoquen viciosamente su ayuda, con la imposición de costas y honorarios de abogados.

Que las alegaciones de la petición de injunction radicada en la corte inferior presentan un caso prima facie meritorio y que las cuestiones levantadas en cuanto a la alegada ilegalidad de los actos contra los cuales se solicita el injunction son cuestiones substanciales y meritorias, ha quedado demostrado por la laudable actitud de los funcionarios demandados, quienes no obstante haber interpuesto la defensa de falta de personalidad del demandante, han pedido insistentemente al tribunal que considere y resuelva en sus méritos las cuestiones legales y constitucionales que el caso nos presenta.

Resolvemos, pues, que el peticionario contribuyente tiene la personalidad y el interés necesarios para poder incoar el procedimiento de injunction.

Segunda: ¿Es que la Ley núm. 16 de 27 de noviembre de 1942 ((2) pág. 51), en la forma en que quedó enmendada por la Ley núm. 181 de mayo 15 de 1943 (pág. 655), una ley de asignaciones continuas autorrenovables cada vez que se agote la partida de $16,000,000 asignada por la sección 14

para dar cumplimiento a los fines de la ley? La pregunta que hemos formulado debe ser contestada negativamente.

La sección 14 de la ley original—núm. 16 de 1942—contiene dos disposiciones completamente separadas y diferentes. La primera es una asignación específica, fija, determinada y global, por una sola vez, de "la suma de diez millones ($10,000,000) de dólares, de cualesquiera fondos existentes en la Tesorería de Puerto Rico no destinados a otras atenciones" para ser gastada dentro de un período de tiempo indeterminado. Por la segunda se creaba un fondo adicional, eventual e indeterminado en cuanto a su monto y sin limitación de tiempo, de "el setenta (70) por ciento de los ingresos del Tesoro Insular por concepto de la recaudación del impuesto federal de rentas internas sobre espíritus destilados embarcados o que se embarcaren de Puerto Rico a Estados Unidos a partir del primero de noviembre de 1942".

El efecto de las enmiendas hechas a la sección 14 de la Ley 16 de 1942 por la Ley 181 de 1943, supra, fué: (a) eliminar por completo el fondo especial creado con el 70 por ciento de los impuestos federales sobre espíritus destilados; (b) asignar o apropiar la suma global de $16,000,000 para dar cumplimiento a los fines de la ley; y (c) disponer que la suma total asignada, o la parte de ella que fuere necesaria a juicio del Consejo Insular de Emergencia, pueda ser gastada en cualquier año económico y hasta tanto no se declare, de acuerdo con la sección 19 de la ley, la terminación del estado de emergencia. El propósito evidente de esta última disposición fué el de evitar que la asignación pudiera ser considerada como utilizable solamente durante un año económico determinado (fiscal year appropriation), en cuyo caso los fondos remanentes al terminar el año fiscal revertirían a los fondos generales del Tesoro.

La interpretación que, a nuestro juicio, debe darse a la sección 14 en su forma enmendada, o sea que la asignación es por la suma total de diez y seis millones, por una sola vez y para ser utilizada en todo o en parte en cualquier año

económico mientras exista el estado de emergencia, encuentra apoyo adicional en las siguientes disposiciones de la misma sección:

"... *Disponiéndose,* que del total de esta asignación la cantidad de cuatro millones (4,000,000) de dólares no estará disponible hasta el primero de julio de 1943; ...

"... *Y, disponiéndose, también,* que de la asignación de diez y seis millones (16,000,000) de dólares que se hace en esta Ley para el programa de emergencia podrá destinarse no más de la suma de dos millones trescientos mil (2,300,000) dólares, etc."

Tenemos ante nos los proyectos P. del S. 28 y P. de la C. 130, presentados en evidencia en la corte inferior. Hemos examinado cuidadosamente los dos mencionados proyectos, ninguno de los cuales llegó a convertirse en ley por no haber sido aprobado por las dos ramas legislativas. El título en uno y otro proyecto es idéntico: "Ley para asignar, de cualesquiera fondos disponibles en el Tesoro Insular no destinados a otras atenciones, la *suma adicional* de $21,500,000 para ser invertida por el Consejo Insular de Emergencia, para llevar a cabo las disposiciones, etc."

En la exposición de motivos del P. del S. 28 se dice:

"El Consejo Insular de Emergencia fué creado por la Ley núm. 16, aprobada en 27 de noviembre de 1942, según fué enmendada por la Ley núm. 181 de 15 de mayo de 1943, con el propósito de llevar a cabo un programa de ayuda, etc.

"Para llevar a cabo tal programa, se ha asignado por la misma Ley, según fué enmendada, la suma de diez y seis millones de dólares ($16,000,000) anuales."

El P. de la C. 130 no contiene exposición de motivos. Por la sección 1, "se asignan de cualesquiera fondos disponibles en el Tesoro Insular", $21,500,000, "cuya suma será puesta a la disposición del Consejo Insular de Emergencia para ser invertida, etc.". La sección 2 lee así: "La suma que por la presente ley se asigna es en adición de la suma asignada por la Ley núm. 16 aprobada en 27 de noviembre de 1942, según posteriormente enmendada." La sección 2 del P. del

S. 28 es idéntica a la sección 2 del P. de la C. 130, que acabamos de transcribir.

Se nos pide que aceptemos como evidencia de la intención legislativa de asignar diez y seis millones anuales, el párrafo segundo que hemos copiado de la exposición de motivos del proyecto del Senado. La proposición debe ser rechazada. Cuando la ley es clara y libre de ambigüedades, como lo es la que estamos examinando, la intención o propósito que tuvo la Asamblea Legislativa al aprobarla no puede ser interpretada a la luz de las manifestaciones contenidas en otra ley aprobada en una sesión posterior y mucho menos por lo que se diga en un proyecto de ley que no ha recibido la aprobación de ambas Cámaras.

No encontramos en la ley vigente ni en los proyectos de ley sometidos a nuestra consideración, nada que revele la intención del legislador de otorgar a los funcionarios ejecutivos que integran el Comité Insular de Emergencia una autorización para utilizar anualmente, o cada vez que se agote la asignación anterior, una nueva partida de $16,000,000.

Tercera: ¿Quedó automáticamente renovada la asignación de diez y seis millones de dólares para el programa de emergencia, por virtud de lo dispuesto por la sección 34 de la Ley Orgánica, al terminar el año fiscal 1943–1944, en 30 de junio de 1944, sin que la Asamblea Legislativa hubiera hecho las asignaciones necesarias para el sostenimiento del Gobierno?

Para poder contestar la pregunta que hemos formulado conviene que hagamos un corto relato de los hechos históricos que motivaron la aprobación por el Congreso Nacional, en julio 15 de 1909, de la ley enmendatoria de nuestra antigua Carta Orgánica (*Ley Foraker*), por virtud de la cual se insertó al final de la sección 31 de dicha Ley Orgánica lo siguiente:

"*Y, disponiéndose, además,* que si a la terminación de cualquier año económico no hubieren sido hechas las asignaciones necesarias para el sostenimiento del Gobierno en el siguiente ejercicio, se considerará asignada una cantidad igual a las sumas consignadas en

las últimas leyes de presupuesto (*appropriation bills*) para tal objeto; y hasta que la Asamblea Legislativa haya hecho lo necesario para dicho sostenimiento, el Tesorero podrá, con la aprobación del Gobernador, hacer los pagos necesarios para los fines antes mencionados."

En el año 1909, por causa de desacuerdos entre la Cámara de Representantes y el Consejo Ejecutivo, la Asamblea Legislativa terminó sus sesiones sin haber aprobado el proyecto de presupuesto o de asignaciones necesarias para el sostenimiento del Gobierno durante el año económico de julio 1, 1909 a junio 30, 1910. Para hacer frente a la crisis creada al Gobierno por la falta de autorización legislativa para usar fondos públicos con que sufragar los gastos necesarios para su sostenimiento, el Congreso Nacional aprobó la enmienda arriba transcrita, conocida por el nombre de su autor, el congresista Sr. Olmsted.

La nueva Ley Orgánica, conocida como "Acta Jones", aprobada en marzo 2 de 1917, contiene al final del primer párrafo de la sección 34 una disposición casi idéntica a la de la enmienda Olmsted y que lee así:

"Si a la terminación de cualquier año económico no hubieren sido hechas las asignaciones necesarias para el sostenimiento del Gobierno en el siguiente año económico, se considerarán asignadas de nuevo, partida por partida, las diferentes cantidades consignadas en las últimas leyes de presupuesto (*appropriation bills*) para los fines y propósitos en ellas especificados, hasta donde las mismas puedan ser aplicables; y hasta que la Asamblea Legislativa haya actuado en dicho sentido, el Tesorero podrá previa consulta con el Gobernador, hacer los pagos necesarios para los fines antes mencionados."

Que lo que tuvo en mente el autor de la enmienda Olmsted fué el resolver la crisis creada por la no aprobación del Presupuesto General—*Appropriation Bill*—para el año 1909–1910, se desprende claramente de sus palabras ante la Cámara en defensa de su proyecto, las cuales aparecen en el Volumen 44 del Congressional Record (mayo 27, 1909) pág. 2465:

". . . mas no importa cuál lado tuvo la razón o dejó de tenerla, ni qué revisión deba hacerse a esta Acta Foraker, el hecho es que

nos encontramos frente a frente con esta situación: Que habiendo terminado la sesión ordinaria de la Legislatura de Puerto Rico, y habiendo suspendido sus sesiones la sesión extraordinaria, y no existiendo disposición alguna para el pago de los gastos necesarios del Gobierno Insular ·después de junio 30 de 1909, es al Congreso a quien corresponde disponer algo.''

Es cierto que más adelante (pág. 2466 C.R.) el mismo señor Olmsted, al oponerse a la insinuación de que la enmienda debería ser efectiva durante un año solamente, se expresó así:

''Podría hacerse, pero no veo ninguna razón de peso para que así se haga. En las leyes de Hawaii y de las Filipinas la insertamos como una disposición permanente. Si desean cambiar *las asignaciones existentes,* ellos se pondrán de acuerdo y así lo harán.''

Parece obvio que al hablar de ''las asignaciones existentes'', el Sr. Olmsted se refería a las asignaciones hechas en las leyes de asignaciones—*appropriation bills*—para atender a los gastos de sostenimiento del Gobierno, aprobadas en años anteriores y que debían reasignarse en los años siguientes.

Nuestro Comisionado Residente en aquella fecha, señor Larrínaga, interpretó el alcance de la enmienda Olmsted en el sentido que indican sus palabras, que copiamos del Vol. 44, página 2520 del Congressional Record: ·

''Sr. Larrínaga: Sugiero, Sr. Presidente, que usted haga exactamente lo que ha aconsejado el Presidente—*que continúe en vigor el presupuesto para el año anterior,* con la condición de que el Acta Foraker sea considerada por el Comité de Asuntos Insulares y enmendada en sentido liberal. Si el caballero por New Jersey acepta mi proposición, yo presentaré una resolución disponiendo que la Ley Foraker sea revisada en la próxima sesión del Congreso, *y el Presupuesto del año pasado continuará en vigor.''* (Bastardillas nuestras).

En la sesión de la Cámara del 7 de junio de 1909, el señor Olmsted, al explicar el propósito de su proyecto, dijo:

''El objeto del proyecto pendiente es remover esa dificultad, disponiendo que las asignaciones sobre las cuales ambas Cámaras de la Legislatura Insular estuvieron conformes *para el año económico en*

*curso* serán consideradas como reasignadas y usadas para el pago de los gastos necesarios, hasta que la legislatura tome acción en cuanto a las asignaciones, y entonces esta disposición, de acuerdo con sus propios términos, dejara de ser efectiva.'' (Bastardillas nuestras).

Consideremos ahora qué es lo que se entiende por ''asignación''—*appropriation*—y ''leyes de asignaciones''—*appropriation bills*.

La Corte Suprema Federal, en el caso de *Bengzon* v. *Secretary of Justice and Insular Auditor,* 299 U.S. 410, 413, 81 L. Ed. 312, ha expuesto en términos claros y precisos la regla para determinar cuando una ley puede ser considerada como ''ley de asignaciones'' o *''appropriation bill''*. Haremos un resumen de los hechos de dicho caso.

La Legislatura de las Islas Filipinas aprobó una ley titulada 'Ley para autorizar el pago de pensiones de retiro a funcionarios y empleados del Gobierno Insular retirados del servicio como resultado de la reorganización o reducción del personal del mismo, incluyendo a los jueces de paz, etc.''

La Ley Orgánica de Filipinas autoriza al Gobernador para ''vedar cualesquiera partida o partidas en cualquiera ley de asignaciones (*appropriation bill*), pero el veto no afectará la partida o partidas a las cuales él no tiene objeción''. En el ejercicio de ese poder, El Gobernador vedó la sección 7 de dicha ley, la cual disponía que los jueces de paz que habían de retirarse tendrían también derecho a las pensiones concedidas por la ley. Bengzon, juez de paz retirado, solicitó la expedición de un auto de *mandamus* para que no obstante el veto de la sección 7 se ordenase el pago de su pensión. La Corte Suprema de Filipinas sostuvo la validez del veto y denegó el mandamus. La sentencia fué revocada por la Corte Suprema Federal, diciendo (pág. 413):

''Este poder excepcional, según se verá, está limitado a los proyectos de asignaciones—*appropriation bills*—; cualquiera otra clase de legislación está sujeta a la regla general. Y su ejercicio está limita.o a la desaprobación de una determinada partida o partidas

de tal proyecto. La cuestión precisa que debemos considerar es—
¿constituye el proyecto que se convirtió en Ley núm. 4051 un pro-
yecto de asignaciones; y, si es así, era la sección 7, dentro del signi-
ficado de la citada disposición de la Carta Orgánica, una partida de
dicho proyecto?

"Debemos observar en primer lugar que el título de la ley no
sugiere en manera alguna que lo que sigue es un proyecto de asig-
naciones; y un examen de la ley misma revela que, con excepción de
la sección 10, el proyecto solamente propone legislación de carácter
general. Eliminando la sección 10, las once secciones restantes po-
drían sostenerse como un acto de legislación general, dejando el
asunto específico de la asignación para ser incluído en una ley pos-
terior. *Es obvio que el término 'appropriation act' no incluiría una
ley de carácter general; y un proyecto sobre legislación general no
se convierte en un 'appropriation bill' por el simple hecho de ha-
berse incluído en el mismo una sección autorizando una asignación.*
Un proyecto de asignación—*appropriation bill*—es aquél cuyo objeto
primario y especial es autorizar la asignación de fondos del tesoro
público. Sostener otra cosa, sería confundir un proyecto de asig-
naciones, autorizando diversas asignaciones, de dinero, con un pro-
yecto en el cual se proponen diversas disposiciones de legislación
general, con una asignación de fondos como un incidente.

"    *        *        *        *        *        *        *

"Si el Gobernador General tuviese la facultad bajo la cláusula 19
de la Ley Orgánica para vedar la sección 7 del proyecto de pensiones
la tendría también para vedar la sección 2 que concede preferencias
a cierta clase de funcionarios y empleados; o la sección 4, que
permite el derecho a elegir entre la pensión que concede la ley que
estamos considerando y una pensión concedida por alguna otra
ley; . . . Todas ellas son partes distintas de una ley de carácter
general. La eliminación de cualesquiera de ellas mediante el ejer-
cicio del poder del veto, permitiendo como conscuencia que las dis-
posiciones restantes del proyecto surtan efecto . . . tendría como
resultado el poner en vigor una ley general en una forma mutilada,
en contra de la intención de la legislatura y tal vez en contra de la
voluntad de la mayoría de cada una de las Cámaras. Esto no sería
la negación de una partida o partidas de las asignadas, mediante el
veto, y sería, en efecto, legislación afirmativa por edicto del ejecu-
tivo." (Bastardillas nuestras).

La regla que acabamos de exponer, aplicada a la situación que estamos considerando, nos lleva forzosamente a la conclusión de que la Ley núm. 16 de noviembre 27, 1942, según fué enmendada por la núm. 181 de 1943, no es una ley de asignaciones—*appropriation bill*—dentro del significado de la sección 34 de la Carta Orgánica. Que la Ley núm. 16 de 1942, según fué enmendada, es legislación de carácter general, se desprende claramente de su título y del contenido de sus veintidós secciones, con excepción de la 14, que es la que contiene la asignación. Por la sección 1, después de exponer los motivos que existen para la aprobación de la ley, se declara la existencia de un estado de emergencia y la urgente necesidad de aprobar un programa para hacerle frente. La sección 2 crea el Consejo Insular de Emergencia. En la sección 3 se enumeran en detalle, en diez párrafos separados, las facultades de que estará investido el Consejo; y en la 4 se especifican sus deberes. El título I, que comprende las secciones 5, 6 y 7 se refiere a la preparación y coordinación de un programa de trabajo de emergencia. Se definen las clases de proyectos que podrán ser incluídos en el programa de trabajo de emergencia. Se autorizan proyectos de siembra, recolección, almacenaje, preservación y distribución de productos alimenticios. Se dispone el término mínimo de trabajo y el salario mínimo a que tendrán derecho los obreros empleados en los proyectos de emergencia. Y se faculta al Consejo para reglamentar el trabajo de dirección y supervisión. El título II, secciones 8, 9, 10 y 11, comprende todo lo concerniente a Compensación de Desempleo, Abaratamiento de Precios y Ayuda Económica General. El título III (sección 12) autoriza al Consejo para establecer organizaciones cooperativas con el propósito de aumentar las facilidades de transportación marítima. Por el Título IV (sección 13) se confiere al Consejo el poder de expropiación forzosa y para fijar las normas y determinar el uso que deberá darse a los bienes expropiados. La sección 15 dispone que los gastos y desembolsos deberán hacerse de acuerdo con las prescripciones de

la Ley Orgánica; la 16 prescribe las estipulaciones que de- berán consignarse en los arreglos, convenios y aportaciones de fondos que haga el Consejo Insular en relación con proyectos de la W.P.A. u otras agencias federales; la 17 autoriza al Consejo para donar fondos al Gobierno Federal o a las agencias federales, insulares o municipales, para comprar y distribuir productos de todas clases y distribuir dinero a personas indigentes. Las secciones restantes se refieren a la forma y manera de dar por terminado el estado de emergencia y a otras disposiciones formales que aparecen en todas las leyes.

Por el examen que hemos hecho se verá sin gran esfuerzo, que la Ley núm. 16 de 1942 es una pieza completa de legislación general, ideada y preparada para hacer frente a una situación anormal de emergencia. La asignación que se hace por la sección 14 es incidental al propósito fundamental de la ley y no tiene el efecto legal de convertir dicha ley en un proyecto o ley de. asignaciones.

Opinamos que los *"appropriation bills"* a que se refiere la sección 34 de la Ley Orgánica y que se renuevan automáticamente al no ser aprobados por la legislatura antes de comenzar el próximo año económico, son, además del *"General Appropriation Bill"*—proyecto general de asignaciones—todos aquellos propiamente llamados "proyectos de asignaciones"—*appropriation bills*—en los cuales se hacen asignaciones anuales de fondos para gastos necesarios para el sostenimiento del Gobierno durante el próximo año fiscal. Aceptamos que los fondos necesarios para el programa de emergencia, si hubiesen sido debidamente asignados, deberían ser considerados como fondos necesarios para el sostenimiento del Gobierno (*Steward Machine Co.* v. *Davis*, 301 U.S. 548), pero no podemos aceptar que la ley que estamos examinando deba ser considerada como una ley de asignaciones dentro del significado de la sección 34 de la Ley Orgánica (*Bengzon* v. *Secretary of Justice, supra*).

La asignación contenida en la Ley núm. 16 no es automáticamente renovable por virtud de la sección 34 de la Ley Orgánica por el hecho de que la ley tenga como su principal objeto el hacer frente a una emergencia. La Ley Orgánica prescribe que los fondos públicos no podrán ser usados sin autorización de la legislatura y no contiene disposición alguna que autorice a la rama ejecutiva del Gobierno para usarlos, sin esa autorización, en casos de emergencia. La agencia federal conocida como W.P.A. fué creada para hacer frente al estado de emergencia nacional; y para dar cumplimiento a sus fines se asignaron por el Congreso muchos millones de dólares de los fondos del Tesoro Federal. Cada vez que los fondos se agotaron, el Congreso hizo nuevas asignaciones y cuando dejó de hacerlas la W.P.A. se vió obligada a suspender sus actividades.

Los aquí peticionarios han interpuesto como defensa adicional que las cortes carecen de jurisdicción para dictar sentencia en contra del Auditor de Puerto Rico, por ser éste un funcionario que de acuerdo con la Ley Orgánica tiene facultades exclusivas para autorizar el desembolso de fondos, aprobar cuentas, etc.

El Auditor ha sido demandado en su capacidad de Auditor y también en su carácter de miembro del Consejo Insular de Emergencia. La defensa interpuesta es, además de académica, prematura. No se trata en el presente caso de impedir que el Auditor autorice la inversión de fondos o apruebe comprobantes de gastos. Si el injunction que se solicita contra los miembros del Consejo Insular de Emergencia fuere decretado, el Auditor de Puerto Rico no tendría oportunidad ni necesidad de actuar en su capacidad oficial como tal Auditor toda vez que no habría gastos ni cuentas que aprobar.

La crisis existe, pero no existen ni imposibilidades ni dificultades insuperables para solucionarla. No es crisis creada por fuerzas que estén fuera del control de la Legislatura, que es la llamada a actuar para solucionarla y no las cortes.

En las arcas de nuestro Tesoro Insular ingresaron durante el año fiscal 1943–44 rentas por un valor total de $101,478,312.62, de los cuales $62,385,623.39 procedían de rentas internas federales sobre bebidas alcohólicas. Existen, pues, en nuestro Tesoro fondos más que suficientes para las necesidades del programa de emergencia. Tenemos una Asamblea Legislativa que puede ser convocada en sesión extraordinaria y que es la única que puede constitucionalmente asignar los fondos necesarios para conjurar la crisis. El remedio no está en nuestras manos.

*El auto de certiorari expedido debe ser anulado y asimismo la resolución dictada por esta corte, de fecha 13 de julio 1944, suspendiendo los efectos del entredicho decretado por la corte inferior, el cual queda restituído en toda su fuerza y vigor, y el caso devuelto a la Corte de Distrito de San Juan para procedimientos ulteriores no inconsistentes con esta opinión.*

Opinión del JUEZ ASOCIADO SR. SNYDER, disintiendo en cuanto al *standing* del contribuyente para entablar el presente recurso, y concurriendo en cuanto a los méritos del caso.

Disiento de la opinión de la mayoría de la corte en este caso porque creo que *Massachusetts* v. *Mellon,* 262 U.S. 447 es completamente aplicable y decisivo de este caso. La Corte Suprema de los Estados Unidos resolvió en dicho caso que un contribuyente no tiene *standing* para solicitar un injunction que prohiba el alegado expendio ilegal o inconstitucional de fondos públicos por los funcionarios del Gobierno. El hecho de que allí estaban envueltos fondos y funcionarios federales y no insulares en manera alguna afecta el principio enunciado en dicho caso. La opinión unánime de la Corte Suprema escrita por el Juez Asociado Sr. Sutherland, dice a las páginas 488–9:

"Las funciones del gobierno bajo nuestro sistema son distribuídas. Al departamento legislativo se le ha encomendado el deber

de hacer leyes; al ejecutivo el deber de ponerlas en vigor; y al judicial el deber de interpretarlas y aplicarlas en casos propiamente traídos ante las cortes. La regla general es que ningún departamento puede invadir las funciones de otro y ninguno puede controlar, dirigir y restringir la acción del otro. No estamos hablando ahora de deberes meramente ministeriales de funcionarios. *Gaines* v. *Thompson,* 7 Wall. 347. No tenemos poder *per se* para revisar y anular leyes del Congreso a base de que son inconstitucionales. Esa cuestión puede ser considerada solamente cuando la justificación de algún daño directo sufrido o amenazado, que presenta una cuestión justiciable, se hace descansar sobre tal ley. Entonces el poder ejercitado es aquél de determinar y declarar la ley aplicable a la controversia. . . . La parte que invoque el poder tiene que estar en aptitud de demostrar no sólo que el estatuto es nulo sino que ha sufrido o está en peligro inmediato de sufrir algún daño directo como resultado de su cumplimiento, y no meramente que él puede sufrir en alguna forma indefinida en común con el pueblo en general. . . . Aquí las partes demandantes no tienen tal caso. Mirando a través de las palabras a la sustancia de su petición, meramente expresa que funcionarios del departamento ejecutivo del gobierno están poniendo en vigor o se proponen hacerlo una ley del Congreso que se alega es inconstitucional; y se nos pide lo impidamos. El hacerlo no sería resolver una controversia judicial, sino asumir una posición de autoridad sobre los actos gubernamentales de otro y coigual departamento, autoridad que claramente no poseemos.''

Esta corte ha citado con aprobación y ha seguido la doctrina establecida en *Alabama Power Co.* v. *Ickes,* 302 U.S. 464, y *Perkins* v. *Lukens Steel Co.,* 310 U.S. 113, que van más lejos que *Massachusetts* v. *Mellon*([1]) al negar acceso a las cortes a aquellos que no reciben daño especial y directo en virtud de las disposiciones de lo estatutos que se atacan y de la acción que bajo los mismos realizan los funcionarios. *Colegio de Farmacéuticos* v. *Junta Insular de Farmacia,* 60 D.P.R. 811; *Gobierno de la Capital* v. *Consejo Ejecutivo de Puerto Rico, etc., et al.,* 63 D.P.R. 434, resuelto el 20 de abril de 1944. La opinión de la mayoría de la corte en este caso me parece estar claramente en conflicto con el principio establecido en *Massachusetts* v. *Mellon* y en nuestros propios casos.

([1]) Véanse Notas, 51 Harv. L. Rev. 897.

38

El principio por el cual subsisten estos casos nunca ha sido expuesto en mejor forma que como lo expuso el Juez Córdova de la Corte de Distrito de San Juan en un caso similar al presente en el que dicho Juez Córdova resolvió que un contribuyente no tiene *standing* para radicar un recurso como el aquí envuelto. En dicho caso, que nunca fué apelado a este tribunal, el Juez Córdova empleó el siguiente lenguaje:

"No se trata de un tecnicismo. Se trata de algo fundamental al sistema de división tripartita de poderes. Mucho se ha discutido y combatido el poder que han asumido las cortes norteamericanas respecto a la determinación de la constitucionalidad de actos legislativos y ejecutivos. La justificación de la actitud asumida por las cortes se encuentra en la necesidad de considerar la validez de esos actos, incidentalmente al determinar los derechos y las obligaciones de partes que plantean una controversia judicial alrededor de esos derechos y obligaciones. Nunca han pretendido, ni pueden pretender, las cortes actuar como fiscales del Ejecutivo y de la Legislatura. No tienen facultad para actuar en un vacío. El interés que pueda tener la comunidad, o cualquier ciudadano, como ciudadano, en los actos legislativos o ejecutivos, no es base suficiente para justificar la intervención del poder judicial. No quiere ello decir que aquellos desmanes legislativos o ejecutivos que no afecten directamente los derechos de algún ciudadano o grupo de ciudadanos carezcan de sanción. Otras sanciones, más efectivas aun que las judiciales, existen en una democracia. Y aunque no podemos decir que el Acta Orgánica ha provisto a Puerto Rico de un sistema de gobierno federal democrático, sí es evidente que ha establecido, en principio, el sistema de la división tripartita de poderes, dentro del cual no incumbe al poder judicial intervenir con los actos de los otros poderes a menos que lesionen directamente los derechos o intereses de algún litigante." [2]

Asumo que la cuestión del *standing* para poder radicar este recurso es una cuestión local, y que estamos en libertad de adoptar nuestra propia regla, aun al extremo de no seguir

(²) *Puerto Rico Ilustrado, Inc.* v. *Buscaglia,* civil número 41175, Injunction, Corte de Distrito de San Juan, noviembre 5 de 1942. La Corte Suprema de los Estados Unidos ha reiterado recientemente la misma idea. Ha dicho que la conclusión de que el peticionario "no tenga *standing* para demandar no descansa en un mero formalismo. Lo basamos en fundamentos adentrados hondamente en las divisiones constitucionales de autoridad en nuestro sistema de gobierno y la

a *Massachusetts* v. *Mellon*. Pero estoy de acuerdo con *Massachusetts* v. *Mellon*. Y aun si no lo estuviera, vacilaría grandemente antes de votar una regla contraria, debido al hecho de que la regla de *Massachusetts* v. *Mellon* emana del concepto básico constitucional de la separación de poderes. La Corte Suprema de los Estados Unidos sabiamente nos ha dejado la decisión de cuestiones locales. Al desempeñar tan grave responsabilidad, estoy renuente a votar por un resultado contrario a una decisión de la propia Corte Suprema de los Estados Unidos, particularmente en un caso que impugna nuestro poder para actuar, en la ausencia de un estatuto, en virtud de la doctrina de separación de poderes. Después de todo, esa teoría de gobierno vino a esta Isla de los Estados Unidos Continentales. La Corte Suprema de los Estados Unidos, aunque no está obligada a ello, por deferencia, ha dejado que esta Corte resuelva las cuestiones de derecho civil en los casos que le llegan procedentes de esta jurisdicción. ¿No deberíamos, en cambio, prestar deferencia a la Corte Suprema de los Estados Unidos en una cuestión tan fundamental a la forma americana de gobierno como lo es la separación de poderes?

Además, creo que es nuestro deber, como jurisdicción del derecho civil, actuar cautelosamente cuando se trata de injertar en nuestros estatutos generales el poder de las cortes para restringir la actuación de funcionarios gubernamentales en ausencia de un estatuto específico que nos autorice para conceder tal remedio extraordinario bajo dichas circunstancias. (Véase *Pueblo* v. *Escambrón Beach Club*, 63 D.P.R. 761, resuelto el 5 de junio de 1944). Aun en jurisdicciones del derecho común, algunos estados han rehusado conceder el remedio como el que aquí se solicita hasta que así lo dispusiera expre-

---

impropiedad de interpretaciones judiciales de ley a instancias de aquellos que sólo demuestran un mero posible daño al público." (*Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, a la pág. 132). Como ya se ha dicho, (pág. 125) "para que los querellados tengan *standing* ante la Corte, deben demostrar que existe un daño o amenaza de daño a un derecho específico de ellos, tal como se distingue del interés del público en la administración de la ley."

samente una Ley Estatal. La Corte Suprema de los Estados Unidos ha dicho: "En la actualidad es claro que ni los daños ni la pérdida de ingresos derivados de la acción del Gobierno, que no es una invasión de derechos legales reconocidos, son por sí mismos fuente de derechos legales, en *ausencia de legislación constitucional reconociéndolos como tal.*" (Bastardillas nuestras).[3] ¿Cómo puede justificarse el resultado opuesto en una jurisdicción del derecho civil?

No debemos olvidar el hecho de que las jurisdicción de las cortes de Puerto Rico depende de leyes aprobadas por la Legislatura Insular (Título 48 U.S.C.A. Sección 861). Es nuestra Legislatura la que concede—y retira—la jurisdicción de nuestras cortes para expedir un injunction en éste o en cualquier otra clase de caso. Y no puedo encontrar estatuto alguno que autorice a nuestras cortes a expedir un injunction en éste. Esto por sí sólo debe ser suficiente para que nosotros no intervengamos.

Por tanto yo dejaría sin efecto la orden de entredicho y devolvería el caso a la corte de distrito con instrucciones de que lo desestimaran por los motivos antes expuestos.

Si estuviera expresando las conclusiones de la mayoría, esta opinión terminaría aquí. Pero no tengo compañía en cuanto a este aspecto del caso. Mis colegas han votado lo contrario y han resuelto que es el deber de la corte pasar sobre las cuestiones de derecho sustantivo aquí envueltas. En cuanto a los méritos del caso, estoy completamente de acuerdo con la opinión de la corte y concurro con ella.

---

[3] *Perkins* v. *Lukens Steel,* supra, a la pág. 125.