## PERKINS, SECRETARY OF LABOR, ET AL. *v.* LUKENS STEEL CO. ET AL.

No. 593. Argued April 3, 1940.—Decided April 29, 1940.

Solicitor General *Biddle,* with whom *Assistant Attorney General Shea* and *Messrs. Telford Taylor, Paul A. Sweeney, Warner W. Gardner, Gerard D. Reilly,* and *David Ziskind* were on the brief, for petitioners.

*Mr. Wm. Clarke Mason,* with whom *Messrs. O. Max Gardner, Frederick H. Knight, Harold F. McGuire,* and *Roberts B. Thomas* were on the brief, for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

In exercise of its authority to determine conditions under which purchases of Government supplies shall be made, Congress passed the Public Contracts Act of June 30, 1936.[1] By virtue of that Act, sellers must agree to pay employees engaged in producing goods so purchased "not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular

---

[1] 49 Stat. 2036.

or similar industries or groups of industries currently operating in the locality in which . . . the supplies . . . are to be manufactured or furnished under said contract." The Court of Appeals for the District of Columbia has held that the Secretary erroneously construed the term "locality" to include a larger geographical area than the Act contemplates, and has ordered six Members of the Cabinet including the Secretary of Labor, the Director of Procurement and all other officials responsible for purchases necessary in the operation of the Federal Government, not to abide by or give effect to the wage determination made by the Secretary for the iron and steel industry either as to the complaining companies or any others. In this vital industry, by action of the Court of Appeals for the District of Columbia, the Act has been suspended and inoperative for more than a year.

We must, therefore, decide whether a federal court, upon complaint of individual iron and steel manufacturers, may restrain the Secretary and officials who do the Government's purchasing from carrying out an administrative wage determination by the Secretary, not merely as applied to parties before the Court, but as to all other manufacturers in this entire nation-wide industry. Involving, as it does, the marking of boundaries of permissible judicial inquiry into administrative and executive responsibilities, this problem can best be understood against the background of what took place before the Court of Appeals for the District acted:

July 11, 1938, all the iron and steel companies in the United States were given notice that the Secretary contemplated proceedings for determining the minimum prevailing wage for their industry. On the 25th and 26th of that month, hearings were had before the Public Contracts Board also functioning under the Act. Many companies, and all of those involved here, were represented in the hearings. Companies from the entire United

States filed briefs and submitted information and suggestions, and these producers who are parties here had notice of and actively participated in the various stages of the proceedings.   After the hearing, time for filing of briefs was allowed.   Following investigation of testimony, exhibits, letters, telegrams, briefs, data from the Bureau of Labor Statistics, and arguments of representatives of both labor and industry itself, the Board, October 27, 1938, made its findings of fact, conclusions and recommendations: (a), Accepting recommendations of industry and labor, the Board adopted—with minor exceptions— the definition of the steel industry previously in effect under the National Industrial Recovery Act; (b), "the base rates paid to the workers classified as common laborers" were utilized as a basis for finding the minimum wage prevailing in the industry and a common laborer was defined as "one who performs physical or manual labor of a general character and simple nature, requiring no special training, judgment nor skill"; (c), the view that municipalities be treated as the geographical limit of a "locality" and that different minimum prevailing wage standards be adopted for small as distinguished from larger companies, was rejected.   The Board pointed out that "the main channels of trade in the industry take their course far beyond the confines of local producing areas"; that "conventional measurement of miles on the map to outline the marketing areas of the iron and steel producers" was unsuitable; that "geographic location does not limit the efforts of iron and steel manufacturers to secure Government business"; that "the workers being paid wages below the base rates are employed in large, medium and small size companies and in plants located in all parts of the country"; and that in fixing a "locality" all these factors as well as geographic and economic considerations were relevant.

The majority of the Board suggested two localities, one for the Southern States and another for the remainder of the steel producing States. One member disagreed and insisted upon four localities throughout the nation, but noted that "the Board is agreed on all the essential facts before it in the case." He recognized that "the law . . . permits the division of the country into localities for the purpose of determining minimum wages. No rule is laid down to define the extent of any localities . . . A too minute concept of locality would obviously nullify the law, for each plant must necessarily occupy a different locale or site from every other. To reduce the interpretation of locality to its most minute point would be to find a minimum wage prevailing in each plant . . . When we depart from this interpretation we are immediately thrown upon judgment. . . . Obviously we must look for wage patterns or uniformities. . . . Again judgment must be relied upon for the answer." Excepting to the Board's recommendations, the companies now before this Court urged that the Secretary make a finding of minimum prevailing wages with "locality" given the connotation of a subdivision of the respective States as originally provided in the Bacon-Davis Act.[2]

On December 20, 1938, the Assistant Secretary of Labor, acting for the Secretary, heard arguments and received briefs both from industry and labor organizations. He did not adopt the recommendations of the Board in full, but instead divided the industry of the entire country into six "localities," proceeding, however, upon the view that to construe "locality" to mean small political divisions of the States, as the Bacon-Davis Act had done in express terms, would render "effective administration of the Act . . . almost impossible." It was pointed out that

---

[2] 46 Stat. 1494.

"this narrowly restricted construction of the word 'locality' . . . is contrary to the administrative construction consistently adhered to by the Secretary of Labor in the administration of the Act," and that while Congress had closely followed the language of the Davis-Bacon Act in some respects, it had "carefully avoided the use of the more narrowly restrictive language of 'city, town, village or other civil subdivision.' " In the twenty-two preceding wage determinations under this Act the Secretary's administrative construction of the term had been—with a sole exception—that of geographic areas no smaller than those determined for the steel industry.[3] The determination in question was made January 16, 1939, but was not made operative until March 1, 1939, "in order that industry may make necessary readjustments to comply with the decision."

In their bill for an injunction and a declaratory judgment, these seven producers of iron and steel (respondents here) sought to enjoin as individuals and in their official capacities, the Secretaries of the Labor, Treasury, War, Navy, and Interior Departments, the Postmaster General, the Director of Procurement of the Treasury Department, the Assistant Secretary of Labor, and the Administrator of the Division of Public Contracts of the Department of Labor and their "officers, agents, assistants, employees, representatives and attorneys, and any one associated with or acting in concert or participation with them, or any of them, and their successors in office and each of them, and their officers," etc. The seven companies named as complainants by the bill did not merely pray relief for themselves against the Secretary's wage determination but insisted that all these

---

[3] 2 Fed. Reg. 233, 1333, 1335, 1336, 1337, 1338, 1339, 2960, 2976; 3 Fed. Reg. 64, 224, 257, 889, 1613, 895, 901, 1612, 1153, 2371, 2370, 2537, 3043; 4 Fed. Reg. 4005.

Government officials be restrained from requiring the statutory stipulation as to minimum wages in contracts with any other steel and iron manufacturers throughout the United States.

The District Court declined to interfere so sweepingly with the administration of the Act, even in the temporary restraining order which it granted. Its order ran only against the Secretaries of Labor and the Navy, and specifically limited its benefits to but three of the complaining companies. Recitals in the order indicate that only the Secretary of the Navy had actually solicited bids and that only those three companies were "desirous of bidding." After hearing, this order was dissolved and the Court granted a motion to dismiss the complaint for lack of jurisdiction, inadequacy of the complaint, lack of standing to sue, and because the suit was one against the United States without its consent.[4] A stay pending appeal was denied by the District Court, but the Court of Appeals for the District of Columbia, Justice Edgerton dissenting, by temporary injunction granted the sweeping prayer that all the Government officials and agents designated in the bill be restrained from continuing in effect the Determination made by the Secretary of Labor. By motion for reargument, the restrained officials, represented by attorneys of the Government, asked that the injunction be clarified so as to be "restricted to enjoining enforcement of the Determination against parties to this proceeding . . . and . . . not be extended to other bidders, not parties to this action, and who, for all that appears, may desire to abide by the Determination." In the same motion, the Government asked that employees who might be irreparably injured be protected by "a bond or other security to pay the minimum wages if the appel-

---

[4] The District Court's judgment was rendered without opinion.

lants do not eventually succeed in this case." [5]  The record discloses no action by the Court of Appeals on this motion or on a subsequent motion to dissolve the temporary injunction.[6]  But the temporary injunction, rendering the Act wholly inoperative as to the iron and steel industry was kept in effect and, reversing the District Court, the Court of Appeals, Justice Edgerton again dissenting, remanded with instructions that relief as prayed in the bill be granted.[7]

---

[5] Sections of the Public Contracts Act provide that "breach or violation of any of the representations and stipulations in any contract for the purposes set forth . . . shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of such contract, . . . a sum equal to the amount of any deductions, rebates, refunds, or underpayment of wages due to any employee engaged in the performance of such contract; . . . Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of said contract set forth in Section 1 hereof may be withheld from any amounts due on any such contracts or may be recovered in suits brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; . . ."

[6] The Government's motion to clarify and restrict the temporary injunction and for security was filed March 29, 1939; the motion to dissolve the temporary injunction was filed April 13, 1939. No specific consideration of these motions by the Court of Appeals for the District of Columbia is disclosed in the record. August 4, 1939, after argument on the merits, that Court of Appeals, *per curiam*, Justice Edgerton dissenting, announced that the temporary injunction would be kept in effect, that the judgment of the District Court would be reversed and that the grounds for enjoining the administration of the Act would be set out in an opinion "to be filed shortly." The opinion of the Court of Appeals came down October 3, 1939; Justice Edgerton filed a separate opinion in dissent.

[7] 107 F. 2d 627.

In our judgment the action of the Court of Appeals for the District of Columbia goes beyond any controversy that might have existed between the complaining companies and the Government officials. The benefits of its injunction, and of that ordered by it, were not limited to the potential bidders in the "locality," however construed, in which the respondents do business. All Government officials with duties to perform under the Public Contracts Act have been restrained from applying the wage determination of the Secretary to bidders throughout the Nation who were not parties to any proceeding, who were not before the court and who had sought no relief.

As a result of this judicial action, federal officials had no feasible alternative except to make contracts for imperatively needed supplies for the War and Navy Departments without inclusion of the stipulation which Congress had required. The Public Contracts Act, so far as the steel industry is concerned, has been suspended for more than a year, with no bond or security to protect the public's interest in the maintenance of wage standards contemplated by Congress, should the suspension ultimately appear unwarranted or unauthorized. Here, and below, the Government has challenged the right of the judiciary to take such action, alleging that it constitutes an unwarranted interference with deliberate legislative policy and with executive administration vital to the achievement of governmental ends, at the instance of parties whose rights the Government has not invaded and who have no standing in court to attack the Secretary's determination. The manifestly far-reaching importance of the questions thus raised prompted us to grant certiorari.[8]

Of the six "localities" into which the Secretary's determination divided the steel industry, respondents do business in that consisting of Ohio, Pennsylvania, Delaware,

---

[8] 309 U. S. 643.

Maryland, Kentucky, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine, the District of Columbia, and a part of West Virginia.[9] Their stated grievance was that the construction given to the term "locality" by the Secretary amounted to "a plain error of law in interpreting the Act, . . . and, consequently, in purporting . . . to determine the prevailing minimum wages for persons employed in the manufacture . . . of the iron and steel industry in the six so-called 'localities' set forth in this determination [the Secretary] acted arbitrarily and capriciously and wholly without warrant or authority in law." In particular the complaint alleged—

Respondents had been selling their products to agents of the United States for many years; they wished to continue to bid on Government contracts; their minimum wages had ranged from 53¢ to 56½¢ per hour; if required to pay the 62½¢ per hour minimum rate determined by the Secretary there was grave danger that they would be unable successfully to compete with others for Government contracts; they had a legal right to bid for Government contracts free from any obligation to abide by the minimum wage determination because of alleged illegal administrative construction of "locality"; and if denied the right to bid without paying their employees this minimum wage they would suffer "irreparable and irrecoverable damages" for which the law provided no "plain, adequate or complete remedy."

---

[9] The remaining five localities are: 1, Louisiana, Arkansas, Mississippi, North Carolina, South Carolina, Florida, Oklahoma, Texas, Alabama, Tennessee, Georgia, Virginia, and a part of West Virginia; 2, Washington, Oregon and California; 3, Montana, Idaho, Nevada, Wyoming, New Mexico, Utah, Colorado and Arizona; 4, North Dakota, South Dakota, Nebraska, Kansas, Minnesota, Iowa, Missouri and the area in and about East Saint Louis, Illinois; 5, Wisconsin, Illinois (except the area in and about East Saint Louis, Illinois), Michigan and Indiana.

In staying the effect of the administrative wage determination, the Court of Appeals for the District was of the opinion that "the word locality is one of somewhat indefinite meaning" requiring the Secretary to exercise judgment and discretion "within the proper limits of the meaning of locality," but held that the Secretary's determination in this case went "so far beyond any possible proper application of the words as to defeat its meaning and to constitute an attempt arbitrarily to disregard the statutory mandate."

We are of opinion that no legal rights of respondents were shown to have been invaded or threatened in the complaint upon which the injunction of the Court of Appeals was based. It is by now clear that neither damage nor loss of income in consequence of the action of Government, which is not an invasion of recognized legal rights, is in itself a source of legal rights in the absence of constitutional legislation recognizing it as such.[10] It is not enough that the Secretary of Labor is charged with an erroneous interpretation of the term "locality" as an element in her wage determination. Nor can respondents vindicate any general interest which the public may have in the construction of the Act by the Secretary and which must be left to the political process. Respondents, to have standing in court, must show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law.[11] They claim a standing by asserting that they have particular rights under and even apart from statute to bid and negotiate for Government contracts free from compliance with the determination

[10] *Tennessee Electric Power Co.* v. *Tennessee Valley Authority,* 306 U. S. 118, 137–8; *Alabama Power Co.* v. *Ickes,* 302 U. S. 464; *Massachusetts* v. *Mellon,* 262 U. S. 447.

[11] *Stearns* v. *Wood,* 236 U. S. 75, 78; *Fairchild* v. *Hughes,* 258 U. S. 126, 129.

made by the Secretary of Labor for their industry. Respondents point to § 3709 of the Revised Statutes and to the Public Contracts Act itself.

Section 3709 of the Revised Statutes requires for the Government's benefit that its contracts be made after public advertising.[12] It was not enacted for the protection of sellers and confers no enforceable rights upon prospective bidders.[13] "The United States needs the protection of publicity, form, regularity of returns and affidavit (Revised Stats., §§ 3709, 3718–3724, 3745–3747), in order to prevent possible frauds upon it by others. A private person needs no such protection against a written undertaking signed by himself. The duty is imposed upon the officers of the Government and not upon him."[14] That duty is owing to the Government and to no one else.

---

[12] R. S. 3709 (41 U. S. C. 5) provides: "Except as otherwise provided by law all purchases and contracts for supplies or services, in any of the departments of the Government, and purchases of Indian supplies, except for personal services, shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals."

[13] Cf. *Goldberg* v. *Daniels*, 231 U. S. 218.

[14] *United States* v. *New York & Porto Rico S. S. Co.*, 239 U. S. 88, 92, 93; *American Smelting & Refining Co.* v. *United States*, 259 U. S. 75, 78. Cf. *Colorado Paving Co.* v. *Murphy*, 78 F. 28 (C. C. A. 8th). See 38 Op. Att. Gen. 555, 557. Bidders have not been able to contest the award of contracts as bidders or in their capacity as citizens generally. *O'Brien* v. *Carney*, 6 F. Supp. 761; *B. F. Cummings Co.* v. *Burleson*, 40 App. D. C. 500; *Champion Coated Paper Co.* v. *Joint Committee on Printing*, 47 App. D. C. 141; cf. *Strong* v. *United States*, 6 Ct. Cls. 135. And the view that bidders have no standing in the courts has been generally recognized by the Comptroller General, the Inter-Departmental Board on Contracts of the Bureau of the Budget as well as the Senate Judiciary Committee.

Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.[15] Acting through its agents as it must of necessity, the Government may for the purpose of keeping its own house in order lay down guide posts by which its agents are to proceed in the procurement of supplies, and which create duties to the Government alone. It has done so in the Public Contracts Act. That Act does not depart from but instead embodies the traditional principle of leaving purchases necessary to the operation of our Government to administration by the executive branch of Government, with adequate range of discretion free from vexatious and dilatory restraints at the suits of prospective or potential sellers. It was not intended to be a bestowal of litigable rights upon those desirous of selling to the Government; it is a self-imposed restraint for violation of which the Government—but not private litigants—can complain. Thus, a wage determination by the Secretary contemplates no controversy between parties and no fixing of private rights; the process of arriving at a wage determination contains no semblance of these elements which go to make up a litigable controversy as our law knows the concept.[16] Courts have never reviewed or supervised the administration of such an executive responsibility even where executive duties "require an interpretation of the law."[17] Judicial restraint of those who administer the

---

Hearing before the Comm. on the Judiciary, House of Representatives, 71st Cong., 2nd Sess., on H. R. 5568, Serial 4, Part 1, pp. 16–22, 26–27; Senate Report 433, 74th Cong., 1st Sess.

[15] *Atkin* v. *Kansas*, 191 U. S. 207; *Ellis* v. *United States*, 206 U. S. 246; *Heim* v. *McCall*, 239 U. S. 175; cf. *Federal Trade Commission* v. *Raymond Co.*, 263 U. S. 565.

[16] *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294, 319, 320.

[17] *United States ex rel. Dunlap* v. *Black*, 128 U. S. 40, 48; cf. *Butte, A. & P. Ry. Co.* v. *United States*, 290 U. S. 127, 136, 142, 143.

Government's purchasing would constitute a break with settled.judicial practice and a departure into fields hitherto wisely and happily apportioned by the genius of our polity to the administration of another branch of Government.

This Act's purpose was to impose obligations upon those favored with Government business and to obviate the possibility that any part of our tremendous national expenditures would go to forces tending to depress wages and purchasing power and offending fair social standards of employment. As stated in the Report of the House Committee on the Judiciary on the Bill,[18] "The object of the bill is to require persons having contracts with the Government to conform to certain labor conditions in the performance of the contracts and thus to eliminate the practice under which the Government is compelled to deal with sweat shops."

We find nothing in the Act indicating any intention to abandon a principle acted upon since the Nation's founding under which the legislative and executive departments have exercised complete and final authority to enter into contracts for Government purchases. The Committee Hearings and Reports and the construction of the measure by its sponsors disclose no purpose to invoke judicial supervision over agents chosen by Congress to perform these duties. And §§ 4 and 5 do not subject a wage determination to such review. Provision for hearings and findings by the Secretary with respect to decisions upon breaches of stipulations by contractors, once purchases have been made, is indicative of a lack of intention to create any rights for prospective bidders before a purchase is concluded.

The Act does not represent an exercise by Congress of regulatory power over private business or employment.[19]

---

[18] House Report No. 2946, 74th Cong., 2nd Sess.

[19] Cf. *Ex parte Williams*, 277 U. S. 267, 269, 272; *Great Northern Ry. Co.* v. *United States*, 277 U. S. 172, 180.

In this legislation Congress did no more than instruct its agents who were selected and granted final authority to fix the terms and conditions under which the Government will permit goods to be sold to it. The Secretary of Labor is under a duty to observe those instructions just as a purchasing agent of a private corporation must observe those of his principal. In both instances prospective bidders for contracts derive no enforceable rights against the agent for an erroneous interpretation of the principal's authorization. For erroneous construction of his instructions, given for the sole benefit of the principal, the agent is responsible to his principal alone because his misconstruction violates no duty he owes to any but his principal. The Secretary's responsibility is to superior executive and legislative authority. Respondents have no standing in court to enforce that responsibility or to represent the public's interest in the Secretary's compliance with the Act.[20] That respondents sought to vindicate such a public right or interest is made apparent both by their prayer that the determination be suspended as to the entire steel industry and by the extent of the injunction granted.

The contested action of the restrained officials did not invade private rights in a manner amounting to a tortious violation. On the contrary, respondents in effect seek through judicial action to interfere with the manner in which the Government may dispatch its own internal affairs. And in attempted support of the injunction granted they cite many cases involving contested Government regulation of the conduct of private business.[21] Their cited cases, however, all relate to problems different from those

---

[20] Cf. *General Investment Co.* v. *New York Central R. Co.*, 271 U. S. 228, 230. See also Note 10.

[21] See, e. g., *Utah Fuel Co.* v. *Coal Comm'n*, 306 U. S. 56, 58; *Shields* v. *Utah Idaho Central R. Co.*, 305 U. S. 177; *Waite* v. *Macy*, 246 U. S. 606; *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94; *Gegiow* v. *Uhl*, 239 U. S. 3; *Truax* v. *Raich*, 239 U. S. 33; *Pierce* v. *Society of Sisters*, 268 U. S. 510.

inherent in the imposition of judicial restraint upon agents engaged in the purchase of the Government's own supplies.

The Government can supply its needs by its own manufacturing or by purchase. And Congress can as it always has, either do the purchasing of the Government's goods and supplies itself, or it can entrust its agents with final power to do so and make these agents responsible only to it.[22] Courts should not, where Congress has not done so, subject purchasing agencies of Government to the delays necessarily incident to judicial scrutiny at the instance of potential sellers, which would be contrary to traditional governmental practice and would create a new concept of judicial controversies. A like restraint applied to purchasing by private business would be widely condemned as an intolerable business handicap. It is, as both Congress and the courts have always recognized, essential to the even and expeditious functioning of Government that the administration of the purchasing machinery be unhampered. The Constitution prohibits appropriations for the Army for more than two years,[23] and by statute contracts for the purchase of departmental supplies are in general limited to one year.[24] These prohibitions emphasize the grave importance of leaving the restraint of the Government's purchasing agents to Congress and their executive superiors.

The record here discloses the "confusion and disorder"[25] that can result from the delays necessarily incident to

---

[22] *Great Northern Ry. Co.* v. *United States,* 277 U. S. 172, 182; *Work* v. *Rives,* 267 U. S. 175; *Butte, A. & P. Ry. Co.* v. *United States,* 290 U. S. 127; *United States* v. *Babcock,* 250 U. S. 328; *Louisiana* v. *McAdoo,* 234 U. S. 627; *Adams* v. *Nagle,* 303 U. S. 532, 540–1.

[23] Art. I, § 8, cl. 12.

[24] 41 U. S. C. 13.

[25] Cf. Mr. Chief Justice Taney in *Decatur* v. *Paulding,* 14 Pet. 497, 516.

judicial supervision of administrative procedure developed to meet present day needs of Government and capable of operating efficiently and fairly to both private and public interests. In the appropriate words of Mr. Justice Sutherland, "The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained." [26] For more than a year, Cabinet officers and their subordinates have been enjoined from making the Secretary's determination of minimum wages effective. Meanwhile, iron and steel were needed for the Army and Navy. In order that the military program could proceed, the declared policy of the Congress was abandoned under judicial compulsion and contracts without a minimum wage stipulation have been awarded for more than $65,-000,000.00 worth of iron and steel products since the injunction issued.[27] If the general law permits prospective bidders to challenge each wage determination of the Secretary in the courts, by a like token all employees affected could obtain judicial review. Such a possibility places in bold relief those conditions which led Congress to proceed in this Act upon the belief, to which we have recently alluded,[28] that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." [29]

The case before us makes it fitting to remember that "The interference of the Courts with the performance of the ordinary duties of the executive departments of the Government, would be productive of nothing but mis-

---

[26] *Massachusetts* v. *Mellon*, 262 U. S. 447, 487.

[27] Bulletins Nos. 75 to 176, inclusive, of the Division of Public Contracts of the Department of Labor.

[28] *Federal Communications Commission* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 146.

[29] *Missouri, K. & T. Ry. Co.* v. *May*, 194 U. S. 267, 270.

chief; and we are quite satisfied that such a power was never intended to be given to them." [30]

The District Court properly dismissed the bill and the Court of Appeals for the District of Columbia was in error in finding respondents with standing to bring this action, in ordering the Secretary's determination restrained and in holding respondents entitled to declaratory judgment.[31]

Our decision that the complaining companies lack standing to sue does not rest upon a mere formality. We rest it upon reasons deeply rooted in the constitutional divisions of authority in our system of Government and the impropriety of judicial interpretations of law at the instance of those who show no more than a mere possible injury to the public. The judgment of the Court of Appeals is reversed, and that of the District Court dismissing the bill is affirmed.

*Reversed.*

MR. JUSTICE McREYNOLDS is of opinion that the challenged judgment should be affirmed.

---

[30] *Decatur* v. *Paulding, supra,* at 516.
[31] *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240–1.