**COMMODITY CREDIT CORPORATION,**
Appellant,

v.

**D. Woodrow WORTHINGTON, Appellee.**

No. 7672.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 10, 1958.

Decided Jan. 21, 1959.

Lionel Kestenbaum, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Julian T. Gaskill, U. S. Atty., Goldsboro, N. C., and Samuel D. Slade, Atty., Dept. of Justice, Washington, D. C., on brief), for appellant.

Charles Landrum, Jr., Lexington, Ky., and T. Chandler Muse, Tarboro, N. C. (E. R. Denney, Lexington, Ky., and Cameron S. Weeks, Tarboro, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

An action for a declaratory judgment was brought in the District Court by D. Woodrow Worthington, the appellee here, to invalidate Commodity Credit Corporation's decision not to approve the extension of tobacco price supports through any warehouse operated by him or in which he had any interest. The court sustained Commodity's decision in regard to those warehouses which Worthington actually managed or operated, but invalidated the decision insofar as it applied to warehouses merely owned by him and operated by wholly independent lessees. Commodity appeals from the latter part of the District Court's ruling.

For the purpose of stabilizing farm income and prices, the Commodity Credit Corporation was created as an agency and instrumentality of the United States within the Department of Agriculture. 15 U.S.C.A. § 714. Among the corporation's specific powers is the power to support farm prices through the purchase of farm commodities. In the performance of its purchasing and selling operations, 15 U.S.C.A. § 714c directs that " * * * the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce."

In accordance with this provision, tobacco price supports have been made available through the regular tobacco auction warehouses. Farmer cooperatives have been established in the various tobacco belts, and Commodity enters into contracts to lend them money to buy in tobacco upon which the established support price has not been bid by the regular buyers. Tobacco so purchased is held in the hope of a rise in the market price and a resale at the support price level or higher.

The cooperatives, in turn, contract with auctioneers to offer price supports through their respective warehouses. These contracts provide that if commercial buyers fail to bid enough on a particular basket of tobacco, the auctioneer will "knock it down" to the cooperative. No matter who buys the tobacco, whether the cooperative or a commercial tobacco company, the auctioneer advances the amount of the sale price to the farmer and is later reimbursed by the buyer. The result is that the auctioneer actually administers the extension of price supports, and the success of the entire program depends, in large measure, upon his diligence and integrity.

Contracts between cooperatives and auctioneers are subject to approval by Commodity. Invariably they specify certain duties which the auctioneer must perform. For example, he is required to keep accurate records, make correct payment according to grade, and advance price supports only upon tobacco under "within-quota" marketing cards which has been graded by federal inspectors. He is also required to take every reasonable precaution against the acceptance of unsound, damaged tobacco, or tobacco which has been nested, i. e., arranged to conceal foreign matter or leaves of inferior grade, quality or condition.

While the Government is entitled to recourse through the cooperatives against the warehouseman in the event of loss through the purchase of misgraded or mislabelled tobacco, the success of the entire program depends upon the orderly and responsible marketing of tobacco, and Commodity Credit Corporation certainly has a sufficient interest to justify its insistence that the warehouses be honestly operated.

Reports of irregularities committed by Worthington in the administration of price supports, first reached the Department of Agriculture as early as the end of the 1947 marketing season. A series of violations over the next several years resulted in his criminal conviction on March 26, 1954, on thirty-one counts of

altering inspection certificates and nesting, so that inspection did not reveal concealed inferior tobacco; and on March 2, 1956, on fourteen counts of falsely altering inspection certificates and falsely representing that tobacco had been inspected and weighed by federal inspectors.[1] These violations were persisted in despite repeated warnings by officials of the appellant and other units of the Department of Agriculture.

In April, 1954, after Worthington's first conviction, Commodity concluded that to protect its funds, he had to be excluded from connection with the price support program. It was decided, however, not to bar him completely from contact with the tobacco warehouse business, but to allow loans still to be made available through warehouses owned by him provided he would lease them to wholly independent auctioneers on a fixed cash rental.

At that time the appellee owned ten warehouses, and he proceeded to lease them for the 1954–55 tobacco season. According to witnesses in the District Court, however, investigation by the Department of Agriculture's Investigation and Compliance Division revealed that, in violation of the conditions prescribed for such leasings, Worthington had rented one warehouse to a Mr. Hardy for a percentage of the profits, and had participated with a Mr. Bass in the operation and profits of another.

Commodity's witnesses testified that as a result of these investigations, its officers had serious doubts that any of the warehouses had actually been operated for the sole benefit of the respective lessees. They testified also that they had become convinced that as long as Worthington owned a warehouse he would continue, in spite of his assurances to the contrary, to participate in the business therein conducted. Finally, on July 6,

1955, the decision was reached no longer to make price supports available to warehouses in which he had any interest.

In its opinion, the District Court [157 F.Supp. 505] declared as a general proposition "* * * that as between equals one may not be arbitrarily and maliciously discriminated against by administrative governmental officers in the granting of privileges where the discrimination deprives that party of a property right through the medium of competition or otherwise; * * *" In reviewing Commodity's refusal to deal with Worthington, as an auctioneer, the Court said:

"But in the present case the plaintiff's reputation and past conduct clearly indicate that he is not equal to other tobacco warehouse operators receiving price supports; for his past conduct and reputation indicate a lack of integrity which has manifested itself in the past management (and which the defendant may reasonably presume will manifest itself in the future management) of a tobacco warehousing business. The plaintiff's inequality is the result of his own acts, made, presumably, with knowledge of the law. Hence the refusal of price supports to a tobacco warehouse business which the plaintiff either controls or manages, de jure or de facto, is a result of his own activity, and is not arbitrary or without foundation. The administrative decision in issue, to that extent, does not deny the plaintiff due process of law."

However, the court voided Commodity's decision insofar as it refused price supports to any warehouse business carried on by an independent lessee in a warehouse owned by Worthington. As a warehouse owner or landlord, Worthington was held equal to others, the court deeming the plaintiff's identity in that

---

1. The March 26, 1954, conviction resulted in fines of $1000.00 each on the 31 counts and a one year jail sentence which was suspended on condition that the defendant would pay $25,000.00 of the fines.

For the March 2, 1956, conviction, Worthington was sentenced on April 26, 1956, to $14,000.00 in fines and 12 months in prison. This prison sentence was also suspended and the defendant was placed on probation for two years.

capacity "wholly irrelevant to the business operations and the purposes of the defendant corporation."

In its latter ruling, we think the District Court erred. During the years preceding his exclusion as an auctioneer, Worthington's conduct was so reprehensible that a strong argument could well have been made as early as 1954 for refusing price supports to warehouses in which he had any interest. At that time Commodity would not have been unreasonable in concluding that as a landlord this man would seek to control the auction businesses of his lessees and to repeat his fraudulent conduct whenever he found it to his advantage. Apparently, however, Commodity did not draw this inference then; or if it did, it may have doubted its power to bar all connection by Worthington with warehousing in order to safeguard price support moneys. Worthington was permitted to retain ownership of his warehouses upon his promise to lease to completely independent auctioneers and to refrain from partaking in their activities and sharing in their ventures. Almost at once, it became clear that he would not abide by these restrictions. Despite his pledges to remain only a landlord, Commodity soon learned that Worthington in fact continued actively to participate in the auction businesses. Such was the finding of the District Judge.

While the District Court was correct in saying that the identity of an *independent* warehouse owner is wholly irrelevant to the business operations and purposes of Commodity, Worthington's conduct patently demonstrated that he could not be trusted to separate himself from the business conducted on his premises and from its temptations. The trial judge acknowledged the hazard involved, by saying:

"But the plaintiff's position must be that of pure landlord, having no interest direct or indirect in the actual operation or the business, and any reasonable doubt as to this might justify a refusal or withdrawal of price supports to a business carried on in the plaintiff's warehouse."

The net effect of the District Court's order is to give Worthington yet "another chance." In light of his record of repeated gross and willful misconduct when afforded earlier chances, such an order would require government officials to monitor continuously the operations of any warehouse in which Worthington had an interest; or to face the risk, amounting to probability, of the misuse of public funds. The court, we think, was in error in restricting the agency to a choice between these alternatives. After its frustrating experience with Worthington, refusal to administer the program through him cannot be said to be unfounded, malicious or arbitrary.

We are simply deciding on the record before us that Commodity's action is not shown to have been improper. We do not preclude the possibility of further representations by the appellee to the agency with a view to revision of its present order. In that event, its course should be governed by circumstances as they may then exist.

In its brief and oral argument, Commodity contended that the appellee had no standing to sue and that Congress did not subject to judicial review Commodity's exercise of discretion in administering price supports—in short, that no justiciable issue has been raised. It relied on such cases as Tennessee Electric Power Co. v. T. V. A., 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543; Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Kansas City Power & Light Co. v. McKay, 1955, 96 U.S.App.D.C. 273, 225 F.2d 924; and Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. Subsidiary questions of administrative law were also raised. In a case as plain as this, we find it unnecessary to determine whether in other circumstances, involving a showing of abuse, Commodity's action would be judicially reviewable.

Reversed and remanded for the entry of judgment not inconsistent with this opinion.