AMTECH SYSTEMS CORPORATION, Plaintiff-Appellant, v. ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Defendant-Appellee.

First District (6th Division) No. 1—93—1300

Opinion filed June 24, 1994.

Anton R. Valukas, Joel T. Pelz, and Edward F. Malone, all of Jenner & Block, of Chicago, for appellant.

Roland W. Burris, Attorney General, and Daniel J. Pierce, Special Assistant Attorney General, of Daniel J. Pierce, P.C., both of Chicago (Frank M. Howard and Algirdas Ambutas, Special Assistant Attorneys General, of Illinois State Toll Highway Authority, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff Amtech Systems Corporation (Amtech) filed a complaint in the circuit court of Cook County against defendant The Illinois State Toll Highway Authority (the Authority), seeking both a preliminary and permanent injunction to invalidate a request for proposals issued by the Authority in 1992 (1992 RFP) and to void any contract awarded pursuant to that RFP. Amtech alleged that because the 1992 RFP was a "sole-source" procurement, it violated sections 16 and 16.1 of the Illinois Highway Code (Ill. Rev. Stat. 1991, ch. 121, pars. 100—16, 100—16.1), as well as the Authority's own rules and regulations governing purchasing practices.

More specifically, Amtech, a manufacturer of automatic vehicle identification (AVI) equipment, contended that the 1992 RFP was drafted in such a manner that only one manufacturer, AT/Comm, could meet the requirements of the RFP, effectively denying Amtech and all other manufacturers the opportunity to have their products fairly considered for this multi-million dollar public construction project. On April 6, 1993, the trial court granted the Authority's motions to dismiss with prejudice on the grounds that Amtech lacked standing and that, due to the lack of standing, the complaint failed to state a cause of action. Amtech appeals. The pertinent facts follow.

Amtech alleges that it is the world's leading supplier of products and services utilizing its proprietary radio frequency identification (RFID) technology for the transportation and intelligent vehicle highway systems (IVHS) (some of which are referred to as AVI systems) markets. RFID technology permits the remote identification of, and communication with, objects such as vehicles and other transportation equipment through the use of radio signals. Amtech also designs, manufactures, markets, and supports a line of hardware and software products.

In a typical Amtech RFID system, a small transponder device (tag) is attached to a mobile object. When that tagged object passes through a zone covered by an interrogator (reader), an identification code is retrieved electronically from the tag via radio frequency. Amtech alleges that this technology is being utilized in IVHS markets across the United States for nonstop, high-speed, cashless electronic toll and revenue collection on highways and bridges, in tunnels and at airports to enhance motorist convenience and lower operating costs for collecting agencies.

Amtech and its distributors/systems integrators are allegedly the only companies to have successfully implemented nonstop electronic toll collection technology on a large commercial scale in the United States. Amtech claims that over 150 million vehicle revenue transactions per year are currently processed by its IVHS equipment.

The Authority is an instrumentality and administrative agency of the State of Illinois created pursuant to section 1 of the Illinois Highway Code (Ill. Rev. Stat. 1991, ch. 121, par. 100—1) to facilitate vehicular traffic in Illinois by providing convenient, safe and modern highways designed to accommodate the needs of the traveling public. The statute directs the Authority to incorporate into its highway system the benefits of advanced engineering design, skill and experience. The Authority operates a toll highway network of more than 270 miles in northeastern Illinois containing over 300 toll booths. At the time of this complaint, the Authority did not have any toll booth equipped with an IVHS or AVI system.

At the time the Authority was statutorily created, the Illinois legislature also enacted statutes specifically governing the Authority's contracting practices. Section 16 requires open and competitive bidding for all contracts involving construction work in excess of $10,000. Similarly, section 16.1 requires contracts for services or supplies in excess of $7,500 to be subject to open and competitive bidding and further provides that the Authority shall enact rules and regulations governing procurement practices and procedures which shall apply to all purchases or contracts. One such regulation, in particular, provides that: "Invitations to bid will be sent to prospective bidders in sufficient time and in such form to permit full and free competition. Specifications, restrictions or conditions which have the effect of limiting bidding to only one source of supply will be avoided." The Illinois State Toll Highway Authority Purchasing Practices and Procedures and General Provisions (1988), Procedures For Being Placed On Bidders' List and For Sealed Bidding, par. 4(a), at 10 (Tollway Regulations).

In August 1990, the Authority first submitted a request for proposals (1990 RFP) for a "pilot test" of equipment on the Illinois Tollway. Only two bidders responded to this RFP, Amtech and IBM, each of which proposed using Amtech equipment. The Authority rejected both proposals without explanation.

On June 10, 1992, the Authority issued another request for proposals for a "pilot test" AVI toll collection system with video surveillance enforcement which was to be added to the existing toll system. The 1992 RFP did not dictate precisely which technology was to be applied but did specify what the AVI and video systems had to be capable of upon implementation as well as under what conditions the systems must perform and to what accuracy. The subject RFP also allowed contractors to submit exceptions and alternatives. It further described the selection process and the evaluation criteria of the equipment and design, contractor qualifications and the overall pro-

posal and costs. The Authority expressly reserved the right to reject proposals for any reason or convenience and to select a system that appeared to meet specifications even if another proposed system seemed superior.

Michael Breslin, Amtech's marketing senior vice-president, testified at his deposition hearing to the following. Amtech and the AVI industry in general were aware that the Authority would be issuing the subject RFP. Amtech, however, had decided in 1991 that it would not bid on the RFP as the prime or general contractor. Breslin testified that the AVI industry is a very competitive business. He stated that he was aware weeks before the RFP was issued that it would request a "read write" technology and that when he actually reviewed the RFP, he opined that more than one of the available technologies could comply. After its issuance, Amtech spent considerable time and money, between $50,000 and $100,000, working on a response in an attempt to convince prime contractors to bid Amtech technology as a subcontractor. Breslin stated that the greater the number of technologies proposed, the more indicative it is of the competitiveness of the proposal.

According to the affidavit of Cassandra Mills, the Authority's operations support manager, the vendors of AVI technology at the time of the RFP's issuance included Amtech, AT/Comm, Mark IV/ Vapor, AT&T, Premid, Hughes and Micro Design. When the bids were opened on August 20, 1992, prime contractors proposed several AVI technologies from several AVI manufacturers including Amtech, AT/Comm, Mark IV/Vapor, AT&T, Premid and Micro Design. Mills stated that Motorola submitted two responsive bids in the amounts of $4,459,268 and $3,770,473 in response to the RFP, proposing Amtech technology as a subcontractor. Breslin confirmed at his deposition that Motorola proposed an AVI system that accomplished the functional and operational requirements of the toll collection system described in the RFP. Mills stated that Amtech did not submit a bid in response to the subject RFP.

Amtech alleges that the specifications in the 1992 RFP substantially matched the product architecture of a system purportedly available from AT/Comm (a competitor of Amtech), thereby, according to Amtech, effectively making AT/Comm the sole source of supply for the AVI equipment. The specifications were so close to AT/Comm's purported capabilities that AT/Comm wrote to all potential bidders informing them that its purported architecture was "uniquely qualified" to meet the requirements of the 1992 RFP because its system "elegantly and precisely" matched the 1992 RFP.

At least one potential bidder, in addition to Amtech, told the

Authority in writing that the RFP was overly restrictive. The Authority conducted no investigation of these assertions.

Due to the Authority's drafting the RFP to "virtually mirror" the purported capabilities of the AT/Comm system, Amtech alleges that numerous potential bidders, who had previously told Amtech that they wanted to bid its equipment, decided not to bid Amtech equipment. Some of those potential bidders decided not to bid at all, because they did not want to bid the AT/Comm equipment, which allegedly had no proven success in the marketplace. Others submitted bids proposing AT/Comm equipment. Thus, Amtech alleges that it was denied a full and fair competitive opportunity to offer its equipment to system integrators or prime contractors bidding on the 1992 RFP.

Amtech alleges that because responses to the RFP were due on August 20, 1992, it did its best to reconfigure and repackage its product to come as close as it could to the requirements set forth in the 1992 RFP without infringing any purported proprietary rights of AT/Comm. After significant work in this regard, Amtech was able to persuade one prime contractor, Motorola, to submit a bid using Amtech technology.

Amtech alleges that the Authority received seven complete responses and that four of the responses proposed AT/Comm technology, while the other three proposed Amtech, Premid and Mark IV/Vapor. AT/Comm allegedly had never before received a contract from any public agency, and its equipment allegedly never passed a testing program with conclusive results. The review committee gave the AT/Comm equipment the four highest scores on those portions of the evaluation pertaining solely to the AVI equipment and stated in its summary evaluation report that "[t]he only read-write system which reasonably met the specification requirements was the AT/Comm AVI system."

In September 1992, the Authority's Board of Directors authorized the legal department to negotiate a contract for the "pilot test" project with Science Applications International Corporation (SAIC), a systems integrator which had proposed AT/Comm equipment at a bid amount of approximately $3.1 million. Thereafter, in or about October 1992, the Authority and SAIC entered into a contract. Work on the project continued without interruption through April 6, 1993, and Amtech had knowledge of the fact that said work was being done. The Authority spent approximately $2.5 million and substantially completed the contract.

Amtech complained further to the Authority about the illegality of the RFP and any subsequent contract. Agents of Amtech met with

representatives of the Authority to determine if any resolution, short of litigation, could be reached. Those discussions were unsuccessful.

On December 23, 1992, Amtech filed its complaint for injunctive relief against the Authority. On March 12, 1993, following expedited discovery, which included nine depositions and the production of thousands of documents by each side, the Authority filed motions to dismiss pursuant to sections 2—615 and 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, pars. 2—615, 2—619). On March 16, 1993, the Authority obtained leave to file its amended verified answer and affirmative defenses which included: lack of standing; failure to allege facts in support of the complaint; failure to state a cause of action upon which relief could be granted; exemption of the RFP from competitive bid requirements; and *laches*. Briefs in support of and in opposition to the motions were subsequently filed by the parties. On April 6, 1993, the trial court, after hearing arguments on the Authority's motions to dismiss, granted the motions, finding that Amtech lacked standing to challenge the bidding process and therefore was unable to state a cause of action.

The court relied on the proposition that "bidders do not have a recognizable property interest in State government contracts offered pursuant to the Illinois Purchasing Act" and therefore do not have standing to challenge the award of those contracts. It found that although Illinois courts have recognized several exceptions to this rule, none of them applied to Amtech. In addition, the court found that Amtech was not a bidder and that it did not allege either that it was the lowest responsive bidder or that the successful bidder was unqualified under the RFP, allegations deemed to be prerequisites to standing by the court. It further held that Amtech did not allege facts to support its allegation that the Authority sought to ignore or circumvent the open competition bidding requirements. The court also noted that the 1992 RFP specifically made allowances for alternative technologies. Thereafter, the trial court granted both of the Authority's motions on the grounds that Amtech lacked standing and was unable to state a cause of action.

■ Amtech initially contends that the proper standard of review in the present case is that the question at issue is a matter of law which this court should review *de novo*. While we agree with Amtech that the issue is a matter of law, we find that the appropriate standard to be applied here is whether the trial court abused its discretion. (*City of Carbondale v. City of Marion* (1991), 210 Ill. App. 3d 870, 569 N.E.2d 290.) We further note that Amtech does not provide authority for its proposition that a *de novo* review should be employed.

Amtech next contends that the trial court incorrectly interpreted and applied the law governing the standing of a disappointed bidder to challenge the award of a government contract. More specifically, Amtech states that the trial court in this case premised its analysis of whether Amtech had standing on a line of cases descending from *Perkins v. Lukens Steel Co.* (1940), 310 U.S. 113, 84 L. Ed. 1108, 60 S. Ct. 869, a case that is based on the "legal interest" theory of standing which Amtech argues has long been discarded by the Federal courts in favor of the more liberal "zone of interests" theory. Moreover, it contends that *Perkins v. Lukens Steel Co.* has even less relevance to current Illinois law on the issue of standing, which is even more liberal than modern Federal law. Amtech contends that if the trial court had recognized the current invalidity of *Perkins v. Lukens Steel Co.* and the "legal interest" theory of standing, it would have denied the motions to dismiss in this case. Moreover, Amtech argues that public bidding statutes today are designed to ensure that government agencies treat all potential bidders fairly and evenly. Because courts now recognize that wrongfully awarded government contracts cause disappointed bidders "discrete economic injury," Amtech contends that unsuccessful bidders must be allowed to challenge those awards.

■ Along with the doctrines of mootness, ripeness, and justiciability, the doctrine of standing is one of the devices by which courts cull their dockets to preserve for consideration only those disputes which are truly adversarial and capable of resolution by judicial decision. (*Helmig v. John F. Kennedy Community Consolidated School District No. 129*, 241 Ill. App. 3d 653, 610 N.E.2d 152.) The essence of the standing inquiry is whether the party is entitled to have the court decide on the merits of the dispute or particular issue. (*Helmig*, 241 Ill. App. 3d 653, 610 N.E.2d 152.) State courts are not bound to follow Federal law on the issue of standing and generally "have more liberally afforded standing to any plaintiff who shows that he has in fact been aggrieved by an administrative decision." (*Helmig v. John F. Kennedy Community Consolidated School District No. 129* (1993), 241 Ill. App. 3d at 658, 610 N.E.2d at 156.) Furthermore, the courts in our State have recognized that the decision as to standing may differ depending on the issue involved and the nature of the relief sought. *Henderson v. Miller* (1992), 228 Ill. App. 3d 260, 592 N.E.2d 570.

■ Our supreme court examined the doctrine of standing in *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 524 N.E.2d 561, wherein it noted that the United States Supreme Court abandoned the "legal interest" test, at least for actions brought pursuant to the Federal Administrative Procedure Act. In addition, our

supreme court stated that it declined to adopt the "zone of interests" test. It held that both the "legal interest" test and the "zone of interests" tests were too restrictive and tended to confuse the issues of standing and the merits of a case. The court further held that, in Illinois, standing requires only that there be "some injury in fact to a legally cognizable interest" and that "the claimed injury, whether 'actual or threatened' [citation], must be: (1) 'distinct and palpable' [citation]; (2) 'fairly traceable' to the defendant's actions [citation]; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." (*Greer v. Illinois Housing Development Authority*, 122 Ill. 2d at 492-93, 524 N.E.2d at 574-75; *Helmig v. John F. Kennedy Community Consolidated School District No. 129*, 241 Ill. App. 3d 653, 610 N.E.2d 152.) A proponent must, therefore, assert his own legal rights and interests, instead of basing his claim for relief upon the rights of third parties. (*Helmig*, 241 Ill. App. 3d 653, 610 N.E.2d 152.) "Where the effect of the challenged action is generalized, speculative or *de minimus*, the complaining party will not have standing." (*Helmig v. John F. Kennedy Community Consolidated School District No. 129*, 241 Ill. App. 3d at 658, 610 N.E.2d at 156.) Thus, the trial court, when deciding whether a plaintiff has standing, must determine whether the party will benefit from the relief granted. *Helmig*, 241 Ill. App. 3d 653, 610 N.E.2d 152.

Although Amtech concedes that *Greer* did not involve a disappointed bidder, it argues that the trial court should have applied the current Illinois standards of standing set forth in *Greer*. We agree. However, we find that even if the *Greer* test had been applied to this case, the result would not have been different.

Amtech contends that it was deprived of a fair opportunity to participate in the bidding process for a public contract and thereby claims to have been injured by the Authority's violation of State rules governing public contracts which require open and competitive bidding. More specifically, Amtech claims that the Authority blatantly violated Illinois statutes and regulations when it drafted the 1992 RFP so that it was totally biased in favor of one equipment manufacturer. Amtech alleges that several prime contractors, who otherwise would have submitted bids using Amtech equipment, did not do so because they recognized that only AT/Comm equipment could meet the specifications in the 1992 RFP. Thus, only a prime contractor who submitted a bid proposing AT/Comm equipment had any chance to win the contract for the "pilot test" program. Amtech therefore contends that the restrictive nature of the 1992 RFP foreclosed it from having a fair opportunity to sell its equipment and denied the citizens of Illinois the benefits of competitive bidding.

Amtech asserts that this establishes a distinct injury which is fairly traceable to defendant's conduct which could be prevented or redressed by court action, satisfying the standard set forth in *Greer*. Furthermore, it asserts that to deny unsuccessful bidders standing would shield the agencies from judicial review.

Lack of standing is an affirmative defense. (*Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 524 N.E.2d 561.) In the present case, the record reveals that the Authority raised Amtech's lack of standing to bring its complaint against the Authority for preliminary and permanent injunctive relief as an affirmative defense in its amended verified answer. The Authority also asserted Amtech's lack of standing in support of its motion to dismiss with prejudice Amtech's complaint pursuant to section 2—619 of the Code of Civil Procedure.

As mentioned previously, Illinois courts have recognized that the decision as to standing may differ depending on the issue involved and the nature of the relief sought. (*Henderson v. Miller*, 228 Ill. App. 3d 260, 592 N.E.2d 570.) Therefore, while we recognize that there are Illinois cases holding that an unsuccessful bidder has standing to file a complaint against a governmental agency to contest its award of a contract to another entity, we find that there have also been instances where the court has questioned whether the disappointed bidder had standing to sue and remanded the case to the trial court for a factual determination. *Brando Construction, Inc. v. Department of Transportation* (1985), 139 Ill. App. 3d 798, 487 N.E.2d 1132.

Here, the trial court found that the fact that Amtech had not submitted a bid on the 1992 RFP distinguished it from that of other plaintiffs in competitive bidding cases. Amtech contends that the trial court imposed an "absolute bar" to filing suit. Although this was the term used by the trial judge, we find this to have been unfortunate phraseology on his part and find that the court was merely stating that Amtech was not a bidder on the RFP, and that Amtech had not alleged that it was the lowest responsive bidder or that the contract was awarded to an unqualified bidder under the RFP. Furthermore, the court found that Amtech had not alleged any facts supporting its allegation that "the government sought to ignore or circumvent the open competition bidding requirements." Indeed, the court commented that the successful bidder was more responsive and came in with a lower bid. Therefore, even if Amtech could be considered a bidder in this case, the various pleadings, including the complaint, as well as the motions to dismiss, the memoranda filed both in support of and in opposition to the section 2—615 and section

2—619 motions to dismiss and the arguments of counsel satisfied the court that the successful bidder made a responsive bid at a lower price.

Although the trial court found *Greer* distinguishable from the present case, because "the issue was [the] standing of tenants to challenge the illegality of an administrative agency's action" and "not public bidding on Illinois government contracts," it acknowledged that *Greer* required an injury in fact to a legally cognizable right. It further recognized that *Greer* "went on to hold that economic damage in the guise of diminution, either actual or threatened, in the value of real property constituted a legally cognizable interest conferring standing" and that "here there is no [alleged] diminution in property value [ ], either actual or threatened."

■ We find that none of the standing requirements set forth in *Greer* were satisfied here. There was no factual allegation of a distinct injury to Amtech fairly traceable to the Authority's conduct where Amtech did not bid on the subject 1992 RFP, a decision it made, according to Breslin, in 1991. Furthermore, Amtech did not allege that the RFP caused it not to bid, that is that it restrained or precluded Amtech from bidding. In fact, during the bidding period, Amtech worked with contractors and spent between $50,000 and $100,000 to become part of a bid proposal by Motorola which ultimately was not the lowest the Authority received. Moreover, Amtech did not allege that the award went to a nonresponsive or ineligible bidder. Most importantly, however, for purposes of this appeal, Amtech has not presented this court with any persuasive authority supporting its position that an entity, such as itself, which has not bid has standing to file suit after the contract has been awarded, requesting relief that cannot be granted. We note that the test for disappointed subcontractor standing applied in *Contractors Engineers International, Inc. v. United States Department of Veterans Affairs* (5th Cir. 1991), 947 F.2d 1298, a case cited by Amtech wherein a disappointed subcontractor was found not to have standing, is principally based on the "zone of interests" test for standing which, as mentioned previously, our supreme court has declined to adopt.

Therefore, because there is no factually supported allegation of a distinct injury to Amtech or a controversy between adverse parties with Amtech the party requesting the relief "possessing some personal claim, status, or right," there is nothing that will be "substantially likely to be prevented or redressed by the grant of the requested relief." (*Greer v. Illinois Housing Development Authority*, 122 Ill. 2d at 492-93, 524 N.E.2d at 575.) Thus, Amtech's request for an injunction voiding the 1992 contract would not prevent or redress

an injury to Amtech, because none was alleged. This is also true with regard to Amtech's request for a mandatory injunction requiring the Authority to reissue the RFP.

Relying on *National Federation of Federal Employees v. Cheney* (D.C. Cir. 1989), 883 F.2d 1038, Amtech argues that all bidders or potential bidders in a government procurement that has been conducted contrary to law are aggrieved parties. Amtech stresses that the purpose of the standing requirement is not to ensure that the party challenging the award is seeking to protect a legal entitlement, but rather to ensure that the party has a genuine interest in preserving the integrity of the bidding process. Amtech contends that the trial court's decision in this case would greatly alter Illinois' law of standing and place serious limitations on the effectiveness of any competitive bidding statute allowing public agencies, like the Authority, to casually disregard their statutory obligations and award contracts to whomever they choose. The entities with both the factual knowledge and financial incentive to file a lawsuit seeking compliance with State law would be foreclosed from doing so, resulting in neither good law nor good public policy. Therefore, Amtech asserts that it is essential that Illinois courts have the power to order governmental agencies to conduct their procurement practices in accord with both Illinois statutory law and their own regulations on competitive bidding, the central purpose of which is to provide participants with a fair opportunity to compete for public contracts. Such competition is designed to obtain better products at lower prices for use by the general public. Amtech further argues that the companies competing in a public bidding process must have the right to initiate suit when the agencies fail to follow the rules; otherwise, these statutes and regulations are meaningless.

We find Amtech's reliance on *National Federation of Federal Employees v. Cheney* for the proposition that potential bidders are aggrieved parties with standing to be misplaced, as the court held that the appellants in that case did not have disappointed bidder standing to contest "the contracting out decision made" where neither the appellants nor their members bid on a contract, thus, never placing themselves in the special relationship by which the government could hold them to the bid.

Alternatively, Amtech argues that the trial court, as mentioned previously, established an "absolute bar to standing," recognized only three exceptions to that bar and found that Amtech's challenge did not fall within any of them. Amtech contends, however, that there is no case law in this State indicating that a disappointed bidder's standing is limited to these circumstances. Moreover, it asserts that

even if these were the only circumstances in Illinois which would confer standing, there is no explanation provided, either by the trial court here or by the court in *Brando Construction, Inc. v. Department of Transportation*, 139 Ill. App. 3d 798, 487 N.E.2d 1132, the case upon which the court relied, as to why this action does not qualify under the first exception, "the fundamental right to bid" exception, or even what is meant by it. Amtech points out that *Brando* cites to *Master Printers Association v. Board of Trustees of Junior College District No. 508* (N.D. Ill. 1973), 356 F. Supp. 1355, to support the proposition that such a right exists, yet *Master Printers* holds that *Perkins v. Lukens Steel Co.* is no longer good law with regard to the issue of standing. Rather, relying on *Scanwell Laboratories, Inc. v. Shaffer* (D.C. Cir. 1970), 424 F.2d 859, wherein it was held that "foreclosure from an opportunity to bid can result in 'legal injury' and is sufficient to afford standing," the *Master Printers* court found that printing firms that were potential bidders had standing to challenge a city junior college's practice of restricting bidding on the printing of educational materials and booklets to firms that were unionized. (*Master Printers Association v. Board of Trustees of Junior College District No. 508* (N.D. Ill. 1973), 356 F. Supp. 1355, 1357, citing *Scanwell*, 424 F.2d 859.) As such, Amtech claims that the "sole source" nature of the requirements set forth in the Authority's 1992 RFP deprived it of its fundamental right to bid in a free and open competition as mandated by Illinois statutory law and asserts that it has standing to bring this claim.

A review of the record reveals that at the time of the 1992 RFP's issuance, there were approximately seven vendors of AVI technology. The report entitled "Evaluation of AVI Pilot Installation Proposals" which is contained in the record shows that the Authority received complete responses to its 1992 RFP from six prime contractors. Two of the six contractors also provided alternate bids. Thus, in effect, there were eight proposals. While four of the eight proposed using AT/Comm equipment, the other four, including Motorola's, did not. Based on these facts and a reading of the actual 1992 RFP itself, we do not find that the requirements of the 1992 RFP mandate use of a single source. Certainly, Amtech was not denied the fundamental right to bid where it decided before the 1992 RFP was even issued not to bid on the proposal and later spent between $50,000 and $100,000 tailoring its equipment to the requirements set forth in the RFP to the point where it could convince Motorola to bid on the RFP, proposing Amtech equipment, which Motorola did do.

In sum, Amtech has failed to demonstrate a distinct and palpable injury in fact to any legally cognizable interest. Without factually

supported allegations, we find that, based on the test articulated by our supreme court in *Greer*, Amtech did not have standing to challenge the Authority's award of the contract at issue. Consequently, we find that the trial court did not abuse its discretion when it granted the motions to dismiss.

Because of our decision on the standing issue, we need not determine whether Amtech has stated a viable cause of action.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and GIANNIS, J., concur.